USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1847 UNITED STATES OF AMERICA, Appellee, v. TELEX LEBLANC, Defendant-Appellant. ____________________ No. 93-1848 UNITED STATES OF AMERICA, Plaintiff-Appellant, v. TELEX J. LEBLANC, Defendant-Appellee. ____________________ No. 93-1998 UNITED STATES OF AMERICA, Appellant, v. RICHARD E. WEINSTEIN, Defendant-Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Aldrich, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ Frances L. Robinson with whom Davis, Robinson & White, _____________________ _________________________ Thomas Drechsler and Finneran, Byrne, Drechsler & O'Brien were on ________________ ____________________________________ brief for Telex J. LeBlanc. Brian T. Kelly, Assistant United States Attorney, with whom ______________ Donald K. Stern, United States Attorney, and Fred M. Wyshak II, _______________ __________________ Assistant United States Attorney, were on brief for United States of America. Kenneth I. Seiger, by Appointment of the Court, for appellee _________________ Richard E. Weinstein. ____________________ May 24, 1994 ____________________ -2- TORRUELLA, Circuit Judge. In this opinion, we address _____________ sentencing issues which are consolidated from three appeals. In United States v. LeBlanc and United States v. Weinstein, the ______________ _______ ______________ _________ Government has appealed the district court's decision to depart downward from the applicable Sentencing Guideline range. In both cases, the district court ruled that, in essence, the illegal conduct of Telex J. LeBlanc and Richard E. Weinstein was bookmaking, and therefore, it was more appropriate to sentence them pursuant to guidelines established for operating an illegal gambling business, rather than pursuant to the money laundering guidelines, which were applicable to the crimes to which both LeBlanc and Weinstein had pled guilty. For the following reasons, we reverse and remand the cases to the district court for resentencing. In a cross-appeal, LeBlanc v. United States, LeBlanc _______ ______________ claims that the district court erred in its decision not to depart downward from the Sentencing Guidelines based on LeBlanc's medical condition. We dismiss this appeal for want of appellate jurisdiction. I. THE GOVERNMENT'S APPEALS I. THE GOVERNMENT'S APPEALS A. BACKGROUND A. BACKGROUND We view the facts as set forth in the indictment to which the defendants pled guilty, and in unobjected to portions of their respective Presentence Reports ("PSR"). See United ___ ______ States v. Fox, 889 F.2d 357, 358 (1st Cir. 1989); Kerrigan v. ______ ___ ________ United States, 644 F.2d 47, 49 (1st Cir. 1981). _____________ -3- 1. Telex J. LeBlanc 1. Telex J. LeBlanc LeBlanc and two other individuals, Stephen Dickhaut and William Byrne, operated an illegal gambling business during the years 1986 through 1990. Essentially, LeBlanc was convicted of money laundering based upon his acceptance and negotiation of checks from gamblers who bet on various sporting events through the bookmaking business. LeBlanc was an "agent" for his two codefendants who "owned" the business, and LeBlanc had his own "customers" for whom he received commissions. The gamblers' checks were usually made payable to fictitious payees and were in amounts less than $10,000. For instance, one gambler settled a gambling debt with LeBlanc and his codefendants by giving them four cashier's checks from the First National Bank of Boston, all dated November 26, 1990, and each in the amount of $8750. These cashier's checks were payable to a fictitious payee, "J. Johnson." LeBlanc personally negotiated one of these cashier's checks at Baybank Boston on November 27, 1990. On November 12, 1992, a federal grand jury returned a seventeen-count indictment against LeBlanc. Count One charged that between 1986 and 1990, LeBlanc and two other individuals conspired to violate money laundering and currency transaction laws in violation of 18 U.S.C. 371. Counts Two through Four, and Counts Eight through Sixteen, charged LeBlanc and his codefendants with various substantive money laundering crimes including violations of 18 U.S.C. 1956 and 1957, as well as 31 -4- U.S.C. 5324. On January 25, 1993, LeBlanc pled guilty to Counts One, Two, Nine, Eleven, Twelve, Fifteen and Sixteen of the indictment. LeBlanc's guilty pleas were entered pursuant to a plea agreement with the Government, in which LeBlanc agreed that he had in fact violated the money laundering statutes specified in the indictment. The Probation Department then issued its PSR, which indicated that, based upon sentencing "grouping" rules, LeBlanc should be sentenced for money laundering, based upon his guilty plea to 18 U.S.C. 1956(a)(1)(B)(i) and (ii).1 Therefore, the offense level, as set forth in U.S.S.G. 2S1.1, should have been 23.2 The Government suggested that after a three level decrease in offense level for acceptance of responsibility and a three ____________________ 1 Because all of the counts to which LeBlanc pled guilty involved substantially the same harm, the counts were to be "grouped" together pursuant to U.S.S.G. 3D1.2(d). The sentencing guidelines applicable to the specific money laundering offenses to which LeBlanc pled guilty were U.S.S.G. 2S1.1-.3. U.S.S.G. 2S1.1(a)(2) establishes a base offense level of 20 for laundering monetary instruments in violation of 18 U.S.C. 1956(a)(1)(B)(i) and 18 U.S.C. 1956(a)(1)(B)(ii). U.S.S.G. 2S1.2(a) establishes a base offense level of 17 for violations of 18 U.S.C. 1957. U.S.S.G. 2S1.3(a)(1)(A) establishes a base offense level of 13 for structuring transactions in violation of 31 U.S.C. 5324. According to U.S.S.G. 3D1.3, the Guideline section with the highest offense level must be utilized to calculate the Guideline range for these money laundering crimes. Under either U.S.S.G. 3D1.3(a) or (b), the highest offense level (i.e. 20) should have been applied to LeBlanc. 2 In the plea agreement, the Government stipulated that the value of the funds involved in the counts to which LeBlanc pled guilty was less than $600,000. Pursuant to U.S.S.G. 2S1.1(b)(2)(D), three points were added to the base offense level of 20 because the value of the funds exceeded $350,000. -5- point decrease in offense level for LeBlanc's mitigating role, the final total offense level should be 17 with a guideline range of 24-30 months' incarceration. On June 25, 1993, the district court held a final disposition hearing. At this hearing, the court found that the conduct attributable to LeBlanc was essentially that of a bookmaker, who took sporting bets from bettors. His status as a "money launderer" arose solely by virtue of the fact that bets were placed with him by check, and these checks were subsequently either negotiated by him or turned over to Dickhaut and Byrne to be negotiated by them. The court stated that LeBlanc's case involved behavior that fell outside of the "heartland" of a typical money laundering offense and, therefore, warranted a downward departure from the otherwise applicable Guideline range. The court then ruled that the Guideline section established for operating an illegal gambling business was more appropriate, and proceeded to sentence LeBlanc to 12 months' incarceration pursuant to U.S.S.G. 2E3.1, which sets forth an offense level of 12 and a corresponding Guideline range of 10 to 16 month's incarceration for an individual with a Criminal History Category of I. 2. Richard E. Weinstein 2. Richard E. Weinstein Weinstein operated an illegal gambling business from 1986 to 1991. In January 1988, Weinstein began accepting large sports bets from a gambler named Elliot Mael. In order to gamble through Weinstein, Mael would call Weinstein's beeper and leave a -6- code number representing Mael. Weinstein would then call Mael and accept his wagers. Mael would "settle" with Weinstein on a weekly basis, and usually exchanged cash. In October 1988, Mael owed Weinstein approximately $200,000 in gambling debts. To satisfy part of this debt, Mael paid Weinstein $75,000 in cashier's checks. Pursuant to Weinstein's instructions, Mael made nine cashier's checks payable to Brockton Financial Services rather than to Weinstein. The nine cashier's checks were issued by the Bank of New England, and were all dated October 14, 1988. Weinstein then gave these cashier's checks to another bookmaker, James Katz, who cashed them at Brockton Financial Services. The checks were structured so as to avoid currency reporting requirements applicable to cash transactions exceeding $10,000 -- eight checks were for $9,000 and one check was for $3,000. On November 12, 1992, a federal grand jury returned a five-count indictment against Weinstein. Count One charged that between 1986 and 1991, Weinstein and others conspired to violate money laundering and currency transaction laws in violation of 18 U.S.C. 371. Counts Two, Three and Four charged Weinstein with various substantive money laundering crimes, including violations of 18 U.S.C. 1956 and 1957, as well as 31 U.S.C. 5324. On March 4, 1993, Weinstein pled guilty to Counts One through Four of the indictment. Weinstein's guilty pleas were entered pursuant to a plea agreement with the Government in which Weinstein agreed that he had in fact violated the money -7- laundering statutes specified in the indictment. The Probation Department then issued its PSR, which indicated that, based upon sentencing "grouping" rules, Weinstein should be sentenced for money laundering, based upon his guilty plea to 18 U.S.C. 1956(a)(1)(B)(i) and (ii).3 Therefore, the base offense level, as set forth in U.S.S.G. 2S1.1(a)(2), should have been 20. The Government suggested that after a three level reduction for acceptance of responsibility, as well as an additional two level reduction for his mitigating role in the overall conspiracy, the applicable offense level was 15, corresponding to a sentencing range of 21-27 months. On August 5, 1993, the district court sentenced Weinstein. The court departed from the applicable money laundering Guideline range because the court found that Weinstein's behavior essentially constituted bookmaking, and therefore fell outside of the "heartland" of a typical money laundering offense. The court instead adopted a reduced sentencing range based on 2E3.1, which is applicable for operating an illegal gambling business, and which sets forth an offense level of 12 and a corresponding Guideline range of 12 to 18 months' incarceration for an individual with a Criminal History Category of II. The court then sentenced Weinstein to 12 months' incarceration. B. STANDARD OF REVIEW B. STANDARD OF REVIEW ____________________ 3 The sentencing grouping rules operate the same way as in LeBlanc's case to arrive at this conclusion. See supra note 1. ___ _____ -8- The first issue that we must determine is the appropriate standard of review on appeal. Generally, appellate review of a sentencing decision involves three questions: 1) are the departure related circumstances of a sort that the sentencing court can appropriately rely upon to justify its departure; 2) does the record support a finding of fact establishing the existence of such circumstances; and 3) does the record support the "direction and degree" of departure. United States v. _____________ M ndez-Col n, No. 93-1346, slip. op. at 3 (1st Cir. Jan. 19, ____________ 1994); United States v. D az-Villafa e, 874 F.2d 43, 49 (1st ______________ ______________ Cir.), cert. denied, 493 U.S. 862 (1989). In United States v. ____________ _____________ Rivera, 994 F.2d 942 (1st Cir. 1993), we elaborated on the ______ appropriate standard of review which we would employ to address certain sentencing departure issues. Plenary review is . . . appropriate where the appellate court, in deciding whether the allegedly special circumstances are of a "kind" that permits departure, will have to perform the "quintessentially legal" function . . . of interpreting a set of words, those of an individual guideline, in light of their intention or purpose, in order to identify the nature of the guideline's "heartland" (to see if the allegedly special circumstance falls within it). Id. at 951 (citations omitted). Thus, where departure decisions __ "reflect a determination of the purpose of, or an interpretation of the language in, a guideline or statute, plenary review is appropriate." United States v. Rosales, No. 92-1732, slip. op. ______________ _______ at 16 (1st Cir. March 31, 1994) (internal quotations omitted) (citation omitted). -9- The district court issued a Sentencing Memorandum to support its downward departure in United States v. LeBlanc, 825 _____________ _______ F. Supp. 422 (D. Mass. 1993). We quote this memorandum at length, in order to have a complete understanding of the basis for the district court's decision: Congress has empowered district courts to impose a sentence outside the guideline range when the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." l8 U.S.C. 3553(b); U.S.S.G. 5K2.0. This case presents just such a circumstance. It involves behavior that falls outside of the "heartland" of a typical money laundering offense. . . . Here, LeBlanc acted as a bookmaking agent, an offense for which the guidelines set forth a base offense level of 12. It is difficult for this court to conceive of gambling being conducted or transacted in any form other than by money or monetary instruments. Yet, by participating in conduct which calls for a base offense level of 12, LeBlanc was charged with money laundering, which calls for an offense level of 17, given LeBlanc's acceptance of responsibility. In essence, LeBlanc finds himself facing a sentence far in excess of that which is commensurate with his actual conduct. While LeBlanc's conduct may technically constitute money laundering -- an offense to which he has pled guilty -- this court finds that sentencing him pursuant to the strictures of the money laundering statute would present an inequity not adequately taken into consideration by the Sentencing Commission. See [Rivera, ___ ______ 994 F.2d at 947-49]; cf. United States v. ___ _____________ Edgmon, 952 F.2d 1206, 1214 (10th Cir. ______ 1991)("Congress aimed the crime of money laundering at conduct that follows in -10- time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity'"), cert. denied, 112 S.Ct. ____ ______ 3037. LeBlanc took checks from bettors and either negotiated them himself or turned them over to his supervisors, Dickhaut and Byrne. When all of the verbiage and terminology in the indictment are stripped away, that is the sum and substance of the conduct for which he was charged. Accordingly, this court finds that a 5 level downward departure is warranted, resulting in an offense level of 12. United States v. LeBlanc, 825 F. Supp. at 423-24. _____________ _______ In United States v. Weinstein, 828 F. Supp. 3 (D. Mass. _____________ _________ 1993), the court, citing LeBlanc, based its downward departure on _______ an identical rationale. The court reiterated its belief that because it could not conceive of a manner in which gambling operations could be conducted without the exchange of money, application of the money laundering statute to someone who is a bookmaker would always result in a simultaneous application of the money laundering statutes, which would be an impermissible "alternative means of punishing the prior specified unlawful activity." Weinstein, 828 F. Supp. at 5. _________ In both cases, the sentencing court suggested that money laundering offenses that stem from the prior specified unlawful activity of operating an illegal gambling business fell outside of the "heartland" of the money laundering guidelines. The court's decisions were not factually tied to the specifics of the cases of LeBlanc or Weinstein. Rather, the decisions were categorical, legal conclusions centered on the intent and scope -11- of the money laundering statutes, and thereby, the nature of the applicable sentencing guideline's heartland. This was a quintessentially legal question, and as such, subject to plenary review. C. THE DEPARTURE DECISION C. THE DEPARTURE DECISION We first review the district court's departure decisions to determine whether the departure-related circumstances it relied upon to depart downward were appropriate, and more specifically, whether the conduct of LeBlanc and Weinstein fell outside of the heartland of a typical money laundering case. The Government contends that the court construed the scope of 18 U.S.C. 1956 much too narrowly. It claims that the actions of LeBlanc and Weinstein ran afoul of the money laundering statute, and both so admitted by pleading guilty. Therefore, the Government argues, the court should have sentenced them pursuant to the money laundering guideline. LeBlanc and Weinstein contend that the court correctly concluded that their cases were atypical of the usual money laundering case, and that their illegal conduct was simply gambling. Thus, LeBlanc and Weinstein argue that the court properly found that it would be inequitable to sentence them pursuant to the money laundering guideline, and rightfully departed downward. To determine the applicable sentence, a court should first determine the offense guideline section most applicable to the offense of conviction, which is "the offense conduct charged -12- in the count of the indictment . . . of which the defendant was convicted." U.S.S.G. 1B1.2. Both LeBlanc and Weinstein pled guilty to violations of 18 U.S.C. 1956 and 1957, as well as 31 U.S.C. 5324. For sentencing purposes, the operative counts in the indictments charged that LeBlanc and Weinstein violated 18 U.S.C. 1956(a)(1)(B)(i) and (ii).4 To determine the nature of the crime of money laundering, and therefore the scope of the "heartland" of the corresponding sentencing guideline, we look, in part, to the language of the statute and the legislative history associated with it. 18 U.S.C. 1956 provides in pertinent part: (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity - (B) knowing that the transaction is designed in whole or in part - (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine . . . or ____________________ 4 This is so because the counts to which LeBlanc and Weinstein pled guilty involved substantially the same harm, and therefore the counts were grouped together. U.S.S.G. 3D1.2(d). The sentencing grouping rules mandate that a defendant be sentenced pursuant to the guideline section with the highest offense level. U.S.S.G. 3D1.3. In this case, the applicable guideline section is U.S.S.G. 2S1.1(a)(2), which establishes a base offense level for laundering monetary instruments. -13- imprisonment . . . or both. This statute was enacted as part of the Money Laundering Control Act of 1986. See S. Rep. No. 433, 99th Cong., 2d. Sess. (1986); ___ H.R. Rep. No. 855, 99th Cong., 2d. Sess., pt. 1 (1986). The legislative history associated with 1956 indicates that Congress designed the statute to fill "the gap in the criminal law with respect to the post-crime hiding of ill-gotten gains," and intended money laundering to be a separate crime distinct from the underlying offense that generated the money. United ______ States v. Johnson, 971 F.2d 562, 569 (10th Cir. 1992) (citation ______ _______ omitted); United States v. Edgmon, 952 F.2d 1206 (10th Cir. _____________ ______ 1991), cert. denied, 112 S. Ct. 3037 (1992); United States v. ____ ______ _____________ Lovett, 964 F.2d 1029 (10th Cir.), cert. denied, 113 S. Ct. 169 ______ _____ ______ (1992); see also United States v. Stavroulakis, 952 F.2d 686, 691 ________ _____________ ____________ (2d Cir.), cert. denied, 112 S. Ct. 1982 (1992). Congress aimed ____ ______ 1956 "at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" Johnson, 971 F.2d at 569. _______ As noted by the district court, the "classic" money laundering case is where "a drug trafficker collects large amounts of cash from drug sales and, acting with the complicity of a banker or other person in a financial institution, deposits the drug proceeds in a bank under the guise of conducting a legitimate business transaction." United States v. Weinstein, ______________ _________ 828 F. Supp. at 5 (quoting Johnson, 971 F.2d at 568). The Money _______ Laundering Control Act, however, "prohibits a much broader range -14- of conduct than just the 'classic' example of money laundering." Johnson, 971 F.2d at 569. The language of the statute, in _______ conjunction with the definitions provided in 18 U.S.C. 1956(c), indicates that Congress intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes, including illegal gambling. See generally Stavroulakis, 952 F.2d ___ _________ ____________ at 691 ("Section 1956 creates the crime of money laundering, and it takes dead aim at the attempt to launder dirty money . . . . Congress has made clear that concealing the source of illegal gambling proceeds is just as detrimental to society as concealing the source of narcotics money."); United States v. Skinner, 946 _____________ _______ F.2d 176, 177 (2d Cir. 1991).5 There is little question that the conduct to which LeBlanc and Weinstein pled guilty not only comes within the plain language of 18 U.S.C. 1956, but also was within the full contemplation of Congress when it enacted that statute. Weinstein asked gamblers to structure their checks in amounts less than $10,000; he asked that the gamblers make the checks payable to fictitious payees; he received the checks; and he then negotiated the checks. LeBlanc received and negotiated checks obtained from illegal gambling activities, which had been made payable to fictitious payees. The district court suggests that all LeBlanc and Weinstein are really guilty of is gambling, and that the money ____________________ 5 The language of U.S.S.G. 2S1.1 and the associated policy statements are not inconsistent with this interpretation of the scope of the crime of money laundering. -15- laundering statutes were improperly used as an alternative method to punish this underlying offense. As a preliminary matter, if the court did not believe that LeBlanc and Weinstein were guilty of money laundering, the court should have refused to accept their guilty pleas to those offenses for lack of a factual basis. Moreover, LeBlanc and Weinstein did more than conduct illegal gambling businesses. Both took specific and concrete actions to launder the proceeds from these gambling activities. The critical financial transactions occurred after the gamblers had placed and lost their wagers with LeBlanc and Weinstein, when they then negotiated the checks. The court's recharacterization of the actual conduct of LeBlanc and Weinstein ignores the fact that they both pled guilty to, and were guilty of, money laundering, a distinct, successor offense. See, e.g., United ___ ____ ______ States v. Morris, 18 F.3d 562, 569 (8th Cir. 1994). ______ ______ Put simply, the court failed to recognize that defendants had committed two offenses; gambling, followed by money laundering. Its statement that it was "difficult . . . to conceive of gambling being conducted or transacted in any form other than by money or monetary instruments," and that sentencing for money laundering "would present an inequity," misses the point. There was no inequity. Leblanc and Weinstein did not have to act in a manner that patently violated 18 U.S.C. 1956. The court erred by construing the scope of the money laundering statute, and the heartland of its commensurate sentencing guideline too narrowly. The conduct of LeBlanc and -16- Weinstein did, in fact, fall within the "heartland" of a money laundering case, and therefore their conduct was not of a "kind" that properly justified a downward departure. We find that the court erred by departing downward, and that LeBlanc and Weinstein should have been sentenced pursuant to the strictures of the money laundering guideline. -17- II. LEBLANC'S APPEAL II. LEBLANC'S APPEAL A. BACKGROUND A. BACKGROUND At sentencing, LeBlanc moved for a downward departure from the Sentencing Guidelines based upon his physical condition. LeBlanc suffered his first heart attack in 1981 at the age of 34. After pleading guilty in the instant case, while awaiting sentencing, LeBlanc suffered a second heart attack on March 18, 1993. Prior to the first disposition hearing, LeBlanc submitted a medical report to the court from his own physician, Dr. Solomon A. Gabbay. The report stated that "Mr. LeBlanc has a [known] history of coronary artery disease" and that "Mr. LeBlanc will probably require long term therapy for his cardiac history." Dr. Gabbay concluded: "[a]t this point in time I would expect [LeBlanc] to require medicine for the rest of his life." The initial disposition hearing was held on May 20, 1993. The court then continued the hearing and ordered that an independent cardiologist examine LeBlanc, at Government expense, and report the medical findings to the court to determine the extent and seriousness of LeBlanc's cardiac problems. A second disposition hearing was held on June 25, 1993. Pursuant to the court's previous order, LeBlanc had been examined by Dr. Guy L. Reed on June 10, 1993. Dr. Reed issued a report in which he stated that LeBlanc had coronary artery disease. He concluded that LeBlanc's "heart disease is likely to be largely controlled with medication but he is also at risk for recurrent -18- myocardial infarction. Because of his coronary artery disease and hypercholesterolemia, he will continue to need ongoing medical care indefinitely with check-ups at 4-6 month intervals." After reviewing Dr. Reed's report, the court refused to grant LeBlanc a downward departure based on health reasons. The court stated: I don't read this report as being one that would even permit me, let alone persuade me, to go beyond the guidelines. Now, I would put it in those terms; because, if I am wrong, then you can appeal that. In other words, I determine that this report, which we will mark as a Court Exhibit, does not permit me, or there is nothing here that would permit me to go below the guidelines. If I am wrong as a matter of law, you can appeal it, and you can come back and we will re- sentence him. B. THE DEPARTURE DECISION B. THE DEPARTURE DECISION As a general rule, a district court's refusal to grant a downward departure is not appealable. United States v. _____________ Lombardi, 5 F.3d 568, 571 (1st Cir. 1993); United States v. ________ _____________ Hilton, 946 F.2d 955, 957 (1st Cir. 1991); United States v. ______ ______________ Romolo, 937 F.2d 20, 22 (1st Cir. 1991). Appellate jurisdiction ______ does attach, however, where the sentencing court's decision "not to depart is based on the court's mistaken view that it lacks the legal authority to consider a departure." Hilton, 946 F.2d at ______ 957 (quoting Romolo, 937 F.2d at 22). Thus, in order to have ______ jurisdiction, we must conclude that the district court misunderstood its authority to depart under the guidelines. United States v. DiIorio, 948 F.2d 1, 8 (1st Cir. 1991). If we _____________ _______ -19- find that the court understood its power to depart, but refused to exercise that power, we lack jurisdiction to consider the appeal. Id. In fact, the district court acknowledged our __ ability to review its decision when the court stated that it lacked the legal authority to depart based upon the circumstances presented to it, and that LeBlanc could appeal this determination if the court was wrong as a matter of law. We believe that based upon the record, the district court fully understood its ability to depart under the guidelines, but found that it was unable to do so under the facts of this case. LeBlanc contends that the district court erroneously concluded that it was "forbidden" by the guidelines to consider his heart condition as a basis for departure. We do not agree. At the first disposition hearing, LeBlanc moved for a downward departure based on his heart condition and presented supporting evidence from his physician, Dr. Gabbay. The court then continued the hearing and ordered the parties to have a court appointed physician examine LeBlanc to determine the severity of his heart condition. If the court had believed that a downward departure was forbidden, it would not have required the parties to engage in the useless exercise of obtaining an independent physician's opinion. Thus, the court considered the possibility that LeBlanc's heart condition warranted a downward departure, but after reviewing the facts, found that his condition was not serious enough to justify such a departure. The court correctly understood that a departure for -20- medical reasons was "discouraged" by the guidelines. Departures based upon health problems are "discouraged" and can only be justified if the medical problems are "present in unusual kind or degree". Rivera, 994 F.2d at 948. U.S.S.G. 5H1.4 states in ______ pertinent part: Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range . . . . Based upon the facts presented to it at sentencing, the district court did not believe that LeBlanc's heart condition presented an extraordinary physical impairment within the meaning of U.S.S.G. 5H1.4 that would permit the court to depart, much less persuade it to do so, under the Guidelines. LeBlanc suffers from a heart condition. Both Dr. Gabbay and Dr. Reed stated, however, that LeBlanc's heart condition could be treated with medicine. There was no indication in either physicians' medical report that LeBlanc's life would be threatened or shortened by virtue of being incarcerated. Additionally, there was no evidence that the Bureau of Prisons would be unable to adequately accommodate LeBlanc's medical needs. There was nothing in the record which indicated that the sentencing court was mistaken about its power to depart downward. Rather, the court fully understood its departure ability, but concluded that U.S.S.G. 5H1.4 simply did not permit departure under the circumstances. This was a judgment -21- call which was supported by the record. As such, the court's departure decision is not reviewable on appeal. See, e.g., ___ ____ DiIorio, 948 F.2d at 9. _______ For the foregoing reasons, with respect to the _______________________________________________________ Government's appeals, we vacate the sentences of LeBlanc and _________________________________________________________________ Weinstein, and remand the case to the district court for _________________________________________________________________ resentencing. With respect to LeBlanc's cross-appeal, the appeal _________________________________________________________________ is dismissed for want of appellate jurisdiction. _______________________________________________ -22-