# REVISED

United States Court of Appeals,
Fifth Circuit.

No. 95-60093.

UNITED STATES of America, Plaintiff—Appellee-Cross-Appellant, Appellant—Cross-Appellee,

v.

Terry Lynn WINTERS, Defendant—Appellant-Cross-Appellee,

and

David Edward Johns, Defendant—Appellee-Cross-Appellant.

Jan. 23, 1997.

Appeals from the United States District Court for the Northern District of Mississippi.

Before JONES and WIENER, Circuit Judges, and FURGESON,[*] District Judge.

FURGESON, District Judge:

Appellant-Cross Appellee Terry Lynn Winters ("Winters") appeals from his conviction in the court below on the grounds (1) that the district court's modified *Allen*[1] charge was a misstatement of law and (2) that his conviction was against the weight of the evidence. Appellant-Cross Appellee David Edward Johns ("Johns") appeals on the ground that count nine of his indictment was duplicitous in violation of Fed.R.Crim.P. 8(a). Appellee-Cross-Appellant United States appeals on the ground that the district court incorrectly departed downward from the guidelines established by the United States Sentencing Commission in connection with the sentences for Winters and Johns. For the reasons set forth below, we affirm the convictions of Winters and Johns, but we vacate their

---

[*]District Judge of the Western District of Texas, sitting by designation.

[1]" "*Allen*' refers to *Allen v. United States,* 164 U.S. 492, 501-02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). The term describes supplemental instructions urging jurors to forego their differences and reach a unanimous verdict." *United States v. Heath,* 970 F.2d 1397, 1406 n. 2 (5th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993).

sentences and remand for resentencing in compliance with the United States Sentencing Guidelines.

BACKGROUND

In November 1991, Winters and Johns were lieutenants at the Mississippi State Penitentiary ("MSP"). On November 17, 1991, Larry Floyd ("Floyd"), a minimum security inmate at MSP, escaped from the prison facility. He disguised himself in women's clothing, scaled a fence topped with razor wire, and stole a vehicle from the prison grounds. Rounding a turn in the vicinity of the prison, Floyd lost control of the vehicle and rolled it into a ditch. Later investigation of the accident scene revealed a considerable amount of blood in and around the vehicle, apparently from the injuries Floyd sustained in the accident.

Floyd continued his escape on foot, ultimately hiding in an abandoned house near the prison. Upon his capture the following day, Floyd was handcuffed and then beaten by several officers despite the absence of any resistance on his part. Floyd was then placed on his back in a truck for return to MSP. Robert McKnight ("McKnight"), a fellow guard at MSP, testified that during the ride back to the prison, Winters squatted down over Floyd and, while holding his service revolver, rapidly raised and lowered his arm towards Floyd's head. McKnight was prevented from seeing the blows delivered because Winters was between him and the victim. McKnight did, however, testify that Floyd was knocked unconscious by the blows. In fact, the injury was so severe that Winters had the truck stopped to determine whether Floyd was still alive. McKnight further testified that although Floyd did not appear to be bleeding when placed in the truck, he was laying in a small pool of blood upon arrival at the prison. Another prison officer, Rogers, also testified that he saw Winters strike Floyd with his service revolver.

After reaching MSP, Floyd was examined by Dr. John Dial ("Dr. Dial"), who found several wounds to the head and multiple scratches and bruises on Floyd's lower body. The wounds to the head included a large knot above Floyd's right eye, a split lower lip, and a sevethe head. The laceration had severed a small artery and was bleeding profusely. Dr. Dial testified that this wound appeared to be very recent in nature. He further testified that, had the wound occurred the previous

day as a result of Floyd's automobile accident, as argued by Winters, Floyd would almost certainly have bled to death unless he had applied pressure to the wound continuously throughout the night. Dr. Dial noted that the absence of blood found in the abandoned house where Floyd spent the night was also inconsistent with the assertion that such a serious wound occurred the previous day. Finally, Dr. Dial testified that the wound sustained by Floyd was consistent with the type of wound that might result from a blow by a gun barrel.

During the grand jury hearings regarding the incident, McKnight was called to testify. In all his previous statements, he had said nothing happened in connection with the apprehension and return of Floyd. On the evening before McKnight was to testify to the grand jury, Winters and Johns visited McKnight's home. Winters, who was McKnight's superior, told McKnight that, if he stuck to his story that nothing had happened, everything would be all right. On the following day, Johns asked McKnight whether he had seen Winters strike Floyd. McKnight responded in the affirmative. However, later the same day, Johns told FBI Special Agent Mike Beaver that he had not discussed the assault with McKnight and that McKnight had not told him that McKnight saw Winters assault Floyd.

The grand jury indicted five defendants, including Winters and Johns, of various federal crimes. Winters was named in three counts: counts four, five, and nine. Johns was named in count nine. The case was tried for seven days and then went to the jury. After the jury had deliberated for seven hours, the court called it into the courtroom to inquire on its progress. The foreman informed the court that the jury had voted on all but one defendant. Thirty minutes later, the foreperson sent a note stating that the jury was hung on every defendant except for Johns, whom they had found guilty. The court then summoned the jury to the courtroom and delivered a supplemental *Allen* charge. After once again retiring, the jury returned with a conviction of Winters. All other defendants were acquitted.

The jury found Winters guilty of deprivation of rights under color of law in violation of 18 U.S.C. § 242 (count four), use of a firearm during and in relation to a crime in violation of 18 U.S.C.

3

§ 924(d) (count five), and obstruction of justice in violation of 18 U.S.C. § 1503 (count nine). The district court imposed concurrent, 12-month terms of imprisonment for counts four and nine and a consecutive, 60-month term of imprisonment on count five; concurrent, three-year terms of supervised release; a special assessment of $150; and a fine in the amount of $2,000. The district court supported the downward departure from the guideline range on the basis that Winters's crime was a single act of aberrant behavior.

The jury found Johns guilty of influencing and impeding the due administration of justice in violation of 18 U.S.C. § 1503 (count nine). In a downward departure, the district court sentenced Johns to probation for a term of three years and a special assessment of $50. As special conditions of probation, Johns was ordered to participate in a mental health treatment program and to be placed on home confinement with electronic monitoring for six months. The court supported the downward departure because Johns had adverse physical and mental conditions and had a history of decorated military service and distinguished service at the Mississippi Department of Corrections. The court also declared the guideline punishment did not fit the crime. The Government, Winters, and Johns filed timely notices of appeal.

## DISCUSSION

### 1. *Winters's Argument as to the* Allen *Charge*

Winters contends that the district court's modified *Allen* charge was a misstatement of the facts and the law and led the jury to believe that it must reach a verdict or there would be another expensive trial. This court reviews a district court's decision to instruct a deadlocked jury pursuant to *Allen* for abuse of discretion. In order to uphold an *Allen* charge, (1) the semantic deviation from approved *Allen* charges cannot be so prejudicial as to require reversal and (2) the circumstances surrounding the giving of an approved *Allen* charge must not be coercive. *See U.S. v. Heath,* 970 F.2d 1397, 1406 (5th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993).

Winters complains that the district court coerced the jury into finding him guilty by stating that

4

"[i]f you should fail to agree on a verdict as to the remaining counts the case is left open and must be tried again."  Winters asserts this claim despite acknowledging that the modified *Allen* charge given by the court in this case has been explicitly approved by the Fifth Circuit.  *U.S. v. Kimmel,* 777 F.2d 290, 294-295 & n. 4 (5th Cir.1985).  Winters further argues that the *Allen* charge was improper because it was given after the jury had deliberated seven and one half hours and had reached a guilty verdict with respect to defendant Johns.  Winters therefore argues that the jury was coerced into finding him guilty because it deliberated only an additional 30 minutes after the *Allen* charge was given to find him guilty.

We reject Winters's claim.  First, as he acknowledges, the language of the *Allen* charge used by the district court is virtually identical to the language this Circuit has repeatedly approved in the past.  *Id.*  Furthermore, there is no support for the proposition that the reading of the *Allen* charge coerced the jury into reaching a unanimous verdict on the counts against Winters.  The timing of the *Allen* charge and the duration of the deliberation after the reading of the charge do not demonstrate coercion.  *See United States v. Scruggs,* 583 F.2d 238, 241 (5th Cir.1978).  The fact that the jury in this case returned with a guilty verdict against Winters shortly after the *Allen* charge was given does not alone indicate that the charge was coercive.  In fact, the charge obviously did not coerce the jury because at the same time it found Winters to be guilty, it also found the remaining defendants, upon whom it had also been hung, to be not guilty.  *See e.g., U.S. v. Heath,* 970 F.2d at 1406.  Since the *Allen* charge issued by the district court is consistent with other *Allen* charges approved by this Circuit and since there is no evidence suggesting that the charge was coercive, the claim is denied.

## 2. *Winters's Argument as to Weight of Evidence*

Winters also contends that the verdict of the jury was contrary to the overwhelming weight of the evidence.  The standard of review in determining whether there was sufficient evidence to convict a defendant is whether the evidence, when viewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt.  *See U.S.*

5

*v. Flores-Chapa,* 48 F.3d 156, 161 (5th Cir.1995).

Fellow prison officer Rogers testified at trial that he saw Winters strike Floyd with his service revolver while Floyd was not resisting arrest. McKnight, another officer, testified that he saw Winters squat over Floyd and raise and lower his arm at least twice while holding his service revolver. Finally, Dr. Dial testified that the wound sustained by Floyd was consistent with being struck by the edge of a gun barrel and that it was unlikely that Floyd could have sustained the wound more than 12 hours before as a result of his automobile crash. Viewing all the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in support of a conviction, it is clear that there was more than enough evidence before the jury to support the conviction of Winters for assaulting Floyd. This claim is also denied.

### 3. *Johns's Argument as to Duplicity*

Johns argues that count nine of his indictment was impermissibly duplicitous and created the possibility of nonunanimity by the jury because it could find him guilty of one but not all of the acts alleged in the count.[2] Therefore, he argues that each charge should have been rendered in a separate count. Johns, however, did no t raise this claim below. Failure to raise a claim of duplicity in the indictment prior to trial constitutes a waiver of the claim pursuant to Fed.R.Crim.P. 12(f). *United*

---

[2]Count Nine read in relevant part:

On or about April 20-22, 1994, in the Northern District of Mississippi, defendant TERRY LYNN WINTERS, aided and abetted by defendant DAVID JOHNS, did corruptly endeavor to influence and impede the due administration of justice by attempting to influence the testimony of Robert "Bubba" McKnight before a Federal Grand Jury sitting in Oxford, Mississippi, which was investigating November 1991 assaults on inmate Larry Floyd, in order to conceal and cover up evidence of the assaults on Floyd, that is:

On the night of April 20, 1994, DAVID JOHNS and TERRY WINTERS drove to the house of Robert McKnight and told him that if he testified before a federal grand jury in Oxford he should "stick to his story" and that "perjury is hard to prove;"

On April 22, 1994, after Robert McKnight told DAVID JOHNS that he saw TERRY WINTERS assault Larry Floyd on the back of a prison truck on November 18, 1991, DAVID JOHNS told FBI agent Mike Beaver that Robert McKnight had never told DAVID JOHNS that McKnight saw TERRY WINTERS assault Floyd. DAVID JOHNS told agent Beaver that JOHNS and McKnight had not even discussed the assault on Floyd in the last two weeks; all in violation of Title 8, United States Code, Section 1503.

*States v. Razo-Leora,* 961 F.2d 1140, 1146 n. 3 (5th Cir.1992). Defendants are required to make an objection on the basis of duplicity prior to trial precisely so that such error can be corrected prior to the trial and the entire case need not be retried.

Having failed to object to the charges as duplicitous, Johns might also be heard to object that the trial court failed to give a special unanimity instruction. Johns, however, made no request for such an instruction and made no objection to the court's failure to give such an instruction. To preserve error, an objection is necessary under Rule 30 of the Criminal Rules of Federal Procedure, unless the court's action constitutes "plain error" which is error "so fundamental as to have resulted in a miscarriage of justice." *United States v. Yamin,* 868 F.2d 130, 132 (5th Cir.1989) (citing *United States v. Hernandez-Palacios,* 838 F.2d 1346, 1350 (5th Cir.1988)). In light of the circumstances here, we review the failure to give a special instruction on unanimity under the narrow "plain error" standard. *United States v. Baytank (Houston), Inc.,* 934 F.2d 599, 609-610 (5th Cir.1991). Employing that standard, we note that Johns has raised no arguments on appeal that would warrant relief; accordingly, his claim is rejected.

### 4. *The Government's Arguments as to Sentencing*

We have deep respect for the difficult task district courts face in arriving at sentencing decisions. We also understand that, especially after viewing a protracted jury trial, a district court may gain a certain perspective about a case and a defendant that seems to justify a departure from the Sentencing Guidelines, regardless of whether the Guidelines permit the departure. In such cases and, indeed, in most cases, jury trial or otherwise, a district court's decision to depart from the Guidelines is due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court. *Koon v. United States,* --- U.S. ----, ----, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996). "To ignore the district court's special competence—about the ordinariness or unusualness of a particular case—would risk depriving the Sentencing Commission of an important source of information, namely, the reactions of the trial judge to the fact-specific circumstances of the case." *Koon,* --- U.S. at ----, 116 S.Ct. at 2047 (quotations and citations omitted).

7

Nevertheless, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon,* --- U.S. at ----, 116 S.Ct. at 2046. Accordingly, a district court considering a departure from the sentencing Guidelines is required to make the following inquiry:

(1) What features of this case potentially take the case outside of the Guidelines' "heartland" and make it a special or unusual case?

(2) Has the Commission forbidden departures based on those features?

(3) If not, has the Commission encouraged departures on those features?

(4) If not, has the Commission discouraged departures based on those features?

*Koon,* --- U.S. at ----, 116 S.Ct. at 2045.

> Discouraged factors ... are those not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range. Examples include the defendant's family ties and responsibilities, his or her education and vocational skills, and his or her military, civic, charitable, or public service record. The Commission does not view discouraged factors as necessarily inappropriate for departure but says they should be relied upon only in exceptional cases.

*Koon,* --- U.S. at ----, 116 S.Ct. at 2045 (citations and quotations omitted).

> If a factor is unmentioned in the Guidelines, the court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," (*United States v. Rivera,* 994 F.2d 942, 949 (1st Cir.1993)) decide whether it is sufficient to take it out of the heartland of cases. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guideline will be "highly infrequent."

1995 U.S.S.G. ch. 1, pt. A. *Koon,* --- U.S. at ----, 116 S.Ct. at 2045.

"[W]hether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point." *Koon,* --- U.S. at ----, 116 S.Ct. at 2047.

*a. Winters's Sentence*

If the district court had not departed from the Guidelines in this case, Winters would have received a sentence of 108-135 months of imprisonment for violation of 18 U.S.C. §§ 242 and 1503, to which the mandatory consecutive 60 months imprisonment for firearms violations under 18 U.S.C. § 924(c) would have been added. As it stands, however, he received 12 months of prison time for

8

the § 242 and 1503 violations, before adding the 60 months under § 924(c). In sentencing Winters, the court referred to his conduct as being "one particular single act of aberrant behavior by this defendant, ... totally unlike his past respect for the law" and then explained that aberrance as follows:

> [Winters's] steady employment, his support of his family, and the institutional culture or accepted code of conduct that existed at Parchman[ ] may well have led this defendant and others to believe that the beating of a prisoner would be condoned and accepted. Indeed, this defendant crossed the line, so to speak, but it is a factor, a prior code of conduct, or institutional conduct that this court feels it is justified in considering in the totality of circumstances surrounding the downward departure.

The government construes the district court's sentencing colloquy as proffering three separate reasons for its downward departure: (1) an accepted code of conduct or institutionalized culture allowing for inmates who had escaped to be beaten upon recapture; (2) a single act of aberrant behavior; and (3) the defendant's steady employment record and his support of family. The government misconstrues the asserted basis for the court's downward departure.

We read the sentencing colloquy to express but one ground for downward departure, being a single act of aberrant behavior, the aberrance of which the court goes on to explain as being wholly inconsistent with Winters's unblemished prior history of respect for the law and family virtues, coupled with a previously existing (but certainly unwritten and invidious) "code of conduct" for guards and other custodial personnel in the Mississippi prison system, under which the brutalizing of recaptured escapees was condoned if not encouraged. The court implied that this "institutional culture" appeared to have created a subconscious mind set in the defendant (and others with like employment histories) sufficient to nullify the usual constraints of conscience which otherwise might well have prevented his perpetrating such miscreant acts. We see this as a far cry from the government's implication that the sentencing court in some way considered such a reprehensible "institutional culture" to be a mitigating circumstance.[3]

---

[3]Indeed, we are completely satisfied that the district court viewed such a pernicious code of conduct in a prison system with the same indignation as does this court. We trust that no such culture or code continues to exist at Parchman or any other prison or jail within our jurisdiction. But if so much as a vestige does subsist today, let this be a "zero tolerance" warning that no semblance of such an insidious culture will be abided, and that failure to endeavor vigorously to eradicate any lingering manifestations of such a code or culture may render one accountable for

9

Although we have yet to explicitly define aberrant behavior, we have stated that "we are most certain that it requires more than an act which is merely a first offense or "out of character' for the defendant." *United States v. Williams,* 974 F.2d 25, 26 (5th Cir.1992), *cert. denied,* 507 U.S. 934, 113 S.Ct. 1320, 122 L.Ed.2d 706 (1993) (affirming a refusal to depart downward because the robbery involved planning). In reaching our conclusion, we cited the Seventh Circuit with approval, holding that there must be "some element of abnormal or exceptional behavior" such as "a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." *Id.; United States v. O'Brien,* 18 F.3d 301, 303 (5th Cir.1994) *cert. denied* --- U.S. ----, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994) (quoting *United States v. Carey,* 895 F.2d 318, 325 (7th Cir.1990) (aberrant behavior contemplates a spontaneous, seemingly thoughtless act)). The Third, Fourth, and Eighth Circuits have followed the Seventh Circuit's view. *United States v. Marcello,* 13 F.3d 752, 761 (3rd Cir.1994) ("there must be some element of abnormal or exceptional behavior"); *United States v. Glick,* 946 F.2d 335, 338 (4th Cir.1991) (reversed a downward departure because the transport of stolen trade secrets across state lines occurred on several occasion); *United States v. Garlich,* 951 F.2d 161, 164 (8th Cir.1991) (bank fraud scheme over a one year period lacked spontaneity and thoughtlessness).

Under certain circumstances, if this were but one isolated assault upon a prisoner, it might very well have been an act of aberrant behavior. A single act of aberrant behavior can be an appropriate basis for a downward departure. *United States v. O'Brien,* 18 F.3d at 303. However, such a single act is not implicated by Winters's conduct. For example, Winters's subsequent efforts to conceal his wrongdoing remove his actions from consideration as a single act of aberrant behavior. He did not act spontaneously and thoughtlessly when he endeavored to have McKnight continue to lie about the illegal assault. Winters's offense thus cannot be deemed a single act of aberrant behavior because he committed multiple infractions, one in assaulting the prisoner and a second in attempting

violating the clearly-established constitutional right of every arrestee, detainee, and convicted prisoner to be free from such unlawful punishment.

10

to coerce a witness into altering his testimony. As such, Winters's course of criminal conduct is not a proper ground for a downward departure.

Neither can Winters's course of criminal behavior somehow be converted into a single aberrant act by viewing it in the context of his history of lawful behavior, his support of family, and—especially—his being under the influence of the above-said institutional culture or accepted code of conduct. First, the Commission has specifically addressed and incorporated within the Guidelines punishment for crimes that involve the abuse of the public position, *see* U.S.S.G. § 3B1.3 (allowing an increase of two levels for a defendant who committed an offense by abusing a position of public or private trust) and has considered such circumstances to be aggravating rather than mitigating. Therefore, it would be entirely inconsistent to support aberrance of actions for purposes of departing downward by giving consideration to a crime that was not only committed "under color of law" but was allegedly encouraged by an arm of the government. The theory of the Guidelines punishes criminal acts committed under color of law precisely because the Commission considered criminal acts committed by government agents to require a firmer response in order to prevent them. To decide here that either encouraging or condoning such an activity by the branch itself somehow establishes a framework that could convert such behavior into a single instance of aberrant behavior would be entirely inconsistent with the structure and theory of the Guidelines.

The same holds true for Winters's steady employment record and his support of family. First, the Guidelines provide that an offender's "[e]mployment record is not ordinarily relevant in determine whether a sentence should be set outside the applicable Guideline range." U.S.S.G. § 5H1.5. Similarly, the Guidelines provide that "[f]amily ties ... are not ordinarily relevant in determining whether a sentence should be outside the applicable Guideline range." U.S.S.G. § 5H1.6. Additionally, 28 U.S.C. § 994(e) provides, in relevant part, tnd Policy Statement, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general inappropriateness of considering the ... employment record ... [and] family ties ... of the defendant." 28 U.S.C. § 994(e). The Commission considered and expressly discouraged sentencing courts from departing from the

11

Guidelines on the basis of either employment records or family ties. As the Supreme Court noted in *Koon,* such factors may be relied upon only "in exceptional cases." *See Koon,* --- U.S. at ----, 116 S.Ct. at 2045. However, in regard to crimes committed under color of law, it would be inconsistent with the theory and structure of the Guidelines to use these factors in aid of classifying a course of criminal conduct as a single aberrant act.

We realize that the district court had unique perspective concerning the sentence to give Winters and that the court gave its sentencing decision its most lengthy consideration. Still, unless the court's reasons were ones permitted by the Guidelines, the departure cannot stand. We conclude that such is the case here. It was incumbent on the district court to articulate relevant facts and valid reasons why the circumstances of this case were of a kind or degree not adequately considered by the Guidelines and thus sufficient to take it outside the heartland of relevant cases. *See Koon,* --- U.S. at ----, 116 S.Ct. at 2045. In failing to do so, the district court abused its discretion when it departed downward from the Guidelines as applied to Winters.

This is not to say that, on remand, there can be no possibility of a downward departure based on family ties or responsibilities or the defendant's employment. *See Koon,* --- U.S. at ----, 116 S.Ct. at 2050. (Congress did not grant courts authority to decide what sentencing considerations are inappropriate in every case.) But the district court's reasoning fails to cite the compelling facts necessary to satisfy the very high standard for this type of departure from the Guidelines.

*b. Johns's Sentence*

If the court had not departed from the Guidelines, Johns would have received 37-46 months of imprisonment. Instead, he received three years of probation conditioned upon him serving six months of in-home detention. In sentencing Johns, the court gave the following reasons for departing from the Guidelines:

(1) Johns's physical and mental condition;

(2) his decorated military service in Vietnam;

(3) his distinguished service at the prison; and

(4) the court's belief that the punishment under the Guidelines did not fit the crime.

Although it is true that the district court gave the sentencing decision regarding Johns lengthy consideration, the departure cannot stand because, again, the court's reasons for departure are not permitted by the Sentencing Guidelines.

Johns suffers from sarcoidosis, a chronic inflammation of multiple organs. According to a letter from the VA Center, Johns's condition does not need any particular type of treatment and requires only follow-up observation. The Guidelines provide "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range ..." U.S.S.G. § 5H1.3. The Guidelines also provide that "[p]hysical condition ... is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range, e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4.

By way of example, this Circuit has ruled that an offender who suffers from cancer in remission, high blood pressure, a fused right ankle, an amputated left leg, and drug dependency does not justify a downward departure. *See U.S. v. Guajardo,* 950 F.2d 203, 208 (5th Cir.1991), *cert. denied,* 503 U.S. 1009, 112 S.Ct. 1773, 118 L.Ed.2d 432. In relying on Johns's medical and physical conditions, the district court should have expressed why Johns's case should be treated as an exceptional one and taken out of the heartland of cases. *See Koon,* --- U.S. at ----, 116 S.Ct. at 2045. It did not do so. Considering the medical conditions that previously have been held to be inappropriate as factors for departing downward in sentencing, Johns's medical condition also does not appear to rise to the level necessary to make it an exceptional one and justify a downward departure in sentencing.

The Guidelines provide that "[m]ilitary ... service ... [is] not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.11. In making a downward departure, the district court relied on the fact that Johns had two purple hearts and

13

described his service as "distinguished." However, this Circuit has determined that an offender's prior receipt of two purple hearts and a distinguished flying cross did not justify a departure from the Guidelines. *See U.S. v. Peters,* 978 F.2d 166, 171 (5th Cir.1992). Again, the district court does not address why Johns's military service is so extraordinary as to take the case out of the heartland of cases and to justify departing downward from the Guidelines. Therefore, the district court once again abused its discretion in making a departure from the Guidelines based on Johns's service in the military.

Similar to Winters, and discussed *supra,* the district court's reliance on Johns's employment record is not an appropriate reason to deviate from the Guidelines, without some compelling statement that would indicate how this case is outside the normal heartland of cases.

Finally, in sentencing Johns, the court stated that "the punishment, certainly in this instance, does not fit the crime." The fact that the district court believed that the punishment meted out pursuant to the Guidelines did not fit the crime is not enough, without additional articulation, to justify a sentence outside the Guideline range. This Circuit has consistently held that the district court's disagreement with the mandates of the Guidelines is not justifica, U.S. v. Barbontin, 907 F.2d 1494, 1497 (5th Cir.1990). "The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice. In this respect, the Guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system." *Koon,* --- U.S. at ----, 116 S.Ct. at 2053. The district court abused its discretion in basing its decision on the sole ground that the Guidelines inappropriately punished this particular defendant.

## CONCLUSION

For these reasons, the Appellants' convictions are AFFIRMED while the sentences imposed areVACATED and REMANDED for resentencing in the compliance with the Guidelines.

14