EDITH H. JONES, Circuit Judge,
dissenting in part:
Because I disagree that these defendants’ money-laundering is outside the “heartland” of such offenses, I respectfully dissent only from the majority’s downward departure holding. The district court’s departure reduced these defendants’ exposure by 40% to 75% of the otherwise applicable guideline range.
The Sentencing Guidelines were structured to carve out a “heartland” of “typical cases embodying the conduct that each guideline describes.” In typical criminal cases, courts are to impose a sentence within the range set by the guidelines; only if the facts of a particular ease render it unusual or “one to which a particular guideline linguistically applies but where conduct significantly differs from the norm” are courts permitted to depart from the guidelines and impose a sentence outside the range. In commentary, the Commission states that “despite the courts’ legal freedom to depart from the guidelines, they will not do so very often.” U.S.S.G. ch. 1, pt. A(4)(b).
In Koon v. United States, the Supreme Court directed the courts to ask four questions when considering whether a particular case is atypical for departure purposes:
1. What features of this case, potentially, take it outside the Guidelines’ “heartland” and make of it a special, or unusual, case?
2. Has the Commission forbidden departures based on those factors?
3. If not, has the Commission encouraged departures based on those factors?
4. If not, has the Commission discouraged departures based on those factors?
518 U.S. 81, 95, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996) (quoting United States v. Rivera, 994 F.2d 942, 949 (1st Cir.1993)); see also United States v. Hemmingson, 157 F.3d 347, 360-61 (5th Cir.1998); United States v. Winters, 105 F.3d 200, 205 (5th Cir.1997). District courts must articulate “compelling facts necessary to satisfy the very high standard” of departures based on “outside the heartland” reasoning. Winters, 105 F.3d at 208.
The district court justified its departure because the defendants’ money laundering was “incidental” to gambling and because they allegedly did not recirculate the laundered money into the gambling business. As such factors are not mentioned by the Guidelines in connection with departures, the courts must “consider the ‘structure and theory of both relevant individual guidelines and the Guidelines taken as a whole’ and decide whether the factor[s are] sufficient to take the case outside the heartland.” Hemmingson, 157 F.3d at 361 (quoting Rivera, 994 F.2d at 949). It is important to note that departures based on grounds not mentioned in the guidelines, as in this case, should be “highly infrequent.” Id. (quoting U.S.S.G. ch. 1, pt. A(4)(b)).
Neither the district court’s nor the panel majority’s reasoning is persuasive. In no sense can the money laundering here be *380 deemed “incidental” or somehow divorced from the conduct of the illegal enterprise.
The district court considered the laundering of a half million dollars “incidental” in relation to the overall $20 million in bets placed with the Threadgills. To any average observer, a half million laundered dollars is a lot of money. In fact, in a recent telemarketing case, one defendant was sentenced to 60 months imprisonment— much longer than the 42 months imposed here — for laundering only $3,300! United States v. Leonard, 61 F.3d 1181 (5th Cir.1995). Moreover, the devices used by the defendants — checks payable to non-existent names and run through a legitimate front business — embody the classic laundering scheme.
Beyond this, the court might more usefully have compared the amount actually laundered (about $500,000) with the total profits the defendants could have potentially laundered, which were around 1 million dollars,[1] rather than the $20 million in the whole scheme. If the profit approach makes sense at all, then comparing the laundering with the actual profits reflects the defendants’ substantial efforts to conceal their source of income.
Rejecting the government’s profits argument, the majority observes, “[cjriminal organizations need to launder not just the profits from the criminal enterprise, but presumably the gross revenues as well.” Supra p. 378 n. 14. I fully agree. To the extent the defendants laundered the full amount of their gambling revenues ($20 million) by recycling money from losers to winners for a percent of the proceeds, then it cannot possibly be said that the amount of money laundered was “incidental.” The majority cannot have it both ways. Either the government is correct and the amount of profit that could have been laundered was $1 million, making the $500,000 actually laundered proportionately more significant, or, as the majority notes, all of the money taken in by the operation was laundered, negating the district court’s finding that the amount laundered was insignificant. Regardless which reasoning is adopted, this factor used by the district court to conclude that the money laundering was atypical cannot be upheld.
The district court also departed downward because “[tjhere is no evidence that the Defendants used any of this money to finance any other criminal enterprise... This is wrong. From a common-sense standpoint, a typical purpose for operating an illicit gambling ring is to make easy money for personal use — not to fund other criminal ventures. There is nothing unusual about an illegal gambling conspiracy that takes its profits for personal consumption instead of using them as seed money to fund other criminal ventures. See, e.g., United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir.1994); United States v. Termini, 992 F.2d 879 (8th Cir.1993).
More generally, nothing about the appellants’ gambling enterprise and associated money laundering takes the case outside the heartland of money laundering eases. Congress passed the Money Laundering Control Act of 1986 to fill “the gap in the criminal law with respect to the post-crime hiding of ill-gotten gains,” United States v. Johnson, 971 F.2d 562, 569 (10th Cir.1992) (quoting United States v. Edgmon, 952 F.2d 1206, 1213 (10th Cir.1991)), and intended to “criminalize a broad array of transactions designed to facilitate numerous federal crimes, including illegal gambling.” LeBlanc, 24 F.3d at 346; see also Hemmingson, 157 F.3d at 361 (“[T]he money laundering guideline primarily targets large-scale money-laundering, which often involves the proceeds of drug trafficking or other types of organized crime.”). The facts of this case fall well within the contemplation of Congress *381 when it passed the money laundering statute: The appellants collected large amounts of cash to run an illicit gambling operation and, with the complicity of an experienced accountant, deposited the proceeds in a bank in such a way as to evade currency reporting requirements and maintain the guise of conducting legitimate business transactions. See LeBlanc, 24 F.3d at 346. Since the district court did not sufficiently “articulate relevant facts and valid reasons why the circumstances of this case were of a kind or degree not adequately considered by the Guidelines,” Winters, 105 F.3d at 208, I can see no basis for distinguishing this case from other similar money laundering cases. See, e.g. LeBlanc, 24 F.3d at 346-47 (reversing a district court’s decision to depart downward in a gambling/money laundering case because the defendants’ acts were typical of such cases).
Since the facts of this case and factors relied on by the district court are not “highly infrequent,” U.S.S.G. ch. 1, pt. A(4)(b), but in fact are typical of money laundering, I respectfully dissent from the majority’s decision to uphold the downward departure.

. According to the government, the reason the appellants could not have laundered the full $20 million is because they earn money by charging a 10% fee (called "juice”) to the losing gamblers. Thus, assuming they were "even” (had equal bets on each side of the wager), $20 million in wagers would net $1 million.