**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-30552
_____

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

VERSUS

JOHN J. HEMMINGSON

and

ALVAREZ T. FERROUILLET, JR.,

                    Defendants-Appellants.


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


_____

No. 97-30598
_____


UNITED STATES OF AMERICA,

                    Plaintiff-Appellant,

VERSUS

JOHN J. HEMMINGSON

and

ALVAREZ T. FERROUILLET, JR.,

                    Defendants-Appellees.


_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____
September 30, 1998

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


John Hemmingson and Alvarez Ferrouillet, Jr., challenge their convictions of money-laundering; Ferrouillet also challenges his sentence. The government, through the Office of the Independent Counsel, appeals the sentences. We affirm.


I.

The origin of this case lies in the ashes of Henry Espy's failed campaign for Congress. In the spring of 1993, Espy, the Mayor of Clarksdale, Mississippi, and president of the National Conference of Black Mayors ("NCBM"), was a defeated and indebted candidate. He had sought the Mississippi congressional seat vacated by his brother Michael when the latter became Secretary of Agriculture, but he succeeded only in running up a large campaign debt.

Ferrouillet is a New Orleans attorney who had met Henry Espy the previous year and served as chairman of the Espy for Congress campaign. In addition to his lawyerly work, Ferrouillet moonlighted as an insurance broker, managing his own company, Municipal Healthcare Cooperative. He also acted as the NCBM's representative on health care issues and had helped broker deals between municipalities and health insurance companies.

Ferrouillet offered to help Espy pay off his campaign debt and worked with the unsuccessful candidate to obtain a $75,000 loan

2

from a Mississippi bank, then guaranteed the loan on behalf of his law firm, Ferrouillet & Ferrouillet. The campaign proved unable to repay the loan, nor could Ferrouillet come up with the money himself. The loan came due on June 15, but Ferrouillet sought and received an extension to September 30; the deadline was once again pushed back, at his request, to December 31. As the new year dawned and Ferrouillet failed to repay the loan, the bank referred the matter to its attorneys for collection.

In March 1994, Henry Espy held a reception at a private club in Washington, D.C., in hopes of retiring his debt. The event was sparsely attended: Only about twelve potential contributors showed. Present, however, was HemmingsonSSthe president and CEO of Crop Growers, a holding company for several crop insurance firms. At the time of the fundraiser, Congress had begun considering proposals for crop insurance reform, and Crop Growers had openly acknowledged, in its public disclosure forms, the government's power over this heavily-regulated industry.

That evening, Espy asked Hemmingson and the other attendees to raise $10,000 each; he later sent Hemmingson a thank-you letter "for the immediate and much needed assistance you pledged in helping me retire my congressional campaign debt. Friends who come to the aide [*sic*] of friends are never forgotten." The fundraiser proved a failureSSit raised only $10,000, and Ferrouillet labeled it an "absolute disaster"SSbut he was able to secure yet another extension from the bank. Under the new agreement, Ferrouillet would pay off the loan through four monthly post-dated checks

3

beginning in June.

Ferrouillet and Hemmingson met for the first time at Espy's fundraiser. On June 30, they entered into a contract, prepared by Ferrouillet, under which Ferrouillet would act as "Special Corporate Counsel in connection with the development of a comprehensive healthcare plan which [Crop Growers] might co-sponsor, along with [Ferrouillet's business] Municipal Healthcare Cooperative, Inc., for presentation to and implementation within the membership of the National Conference of Black Mayors." Hemmingson then prepared a $20,000 check drawn on a Crop Growers Insurance account and made payable to "Alvarez T. Ferrouillet, Jr., Attorney at Law." He signed the check and mailed it to Ferrouillet in Louisiana.

The contract provided that Ferrouillet would be given the $20,000 as a "retainer" from which he would periodically draw $1,000 as his monthly fee. In exchange, he would help develop Crop Growers's nascent health insurance business by securing NCBM's endorsement. The agreement, which is largely boilerplate and hardly a model of artful drafting, further provided that "[t]he details of our services and the amount of our fees will be provided to you on computer generated statements monthly as our services are rendered . . . . It is very important to maintain close communications."

At the end of July, Ferrouillet cashed the Crop Growers check at Evergreen Supermarket, a neighborhood grocery store in Louisiana. The store's owner, a personal friend of Ferrouillet's,

gave the lawyer $5,000 cash on the spot and, after depositing the check, $15,000 in $100 bills a week later.

Ferrouillet promptly deposited $10,000 in $100 bills into an Espy for Congress bank account that he had opened earlier that year; two days later, he deposited $9,000, again in $100 bills. He then wired $21,000 from the account to the Mississippi bank to be applied against the loan.

In March 1995, FBI agents contacted Ferrouillet. They were investigating the Washington fundraiser and asked the lawyer about the source of his $10,000 deposit. He explained that the money came from individual donors, then provided the agents with a list of forty-six and the amounts each contributed. As the agents began checking the names and realized the list was phony, Ferrouillet's scheme collapsed.[1]

## II.

After a jury trial, Hemmingson was convicted of interstate transportation of stolen property (18 U.S.C. § 2314), money-laundering (18 U.S.C. § 1956(a)(1)(B)(i)), and engaging in a monetary transaction with criminally derived property (18 U.S.C.

---

[1] An obvious question is why Ferrouillet chose to launder the $20,000 rather than simply deposit the money into his own account and write his own check to the bank. His answer is that he received a call, at the end of May 1994, from a Federal Election Commission monitor who had been reviewing Henry Espy's campaign finance reports. She told him that, under federal election law, a loan guarantee is the same as a contributionSSso Ferrouillet had violated the law when he originally guaranteed the loan. Although testimony suggested that his paying off the illegal loan would not have constituted an *additional* offense, Ferrouillet apparently did not realize this. As he paints it, he was trapped: either break the law again in paying off the loan himself, or default and allow the bank to attach his personal assets.

§ 1957). He was acquitted of a separate § 1957 count. Ferrouillet was convicted on all counts: interstate transportation of stolen property (18 U.S.C. § 2314), five counts of money-laundering (18 U.S.C. § 1956(a)(1)(B)(i) & (ii)), two counts of engaging in a monetary transaction with criminally derived property (18 U.S.C. § 1957), and two counts of making false statements to a federal agent (18 U.S.C. § 1001). He subsequently pleaded guilty in the Northern District of Mississippi to one count of conspiracy to make false statements and defraud the United States (18 U.S.C. § 371) and five counts of making false statements to a financial institution (18 U.S.C. § 1014). The Mississippi counts were consolidated with the Louisiana counts for sentencing.[2]

The presentence report ("PSR") stated that the base offense level of each defendant was 22, resulting in a sentencing range of 41 to 51 months, as each had a criminal history category of 1. The government objected to the PSR, asking the court to increase Ferrouillet's offense level by two levels pursuant to U.S.S.G. § 3B1.3 for abusing a position of public trust and using a special skill (his attorney skill) to commit his crimes. The district court denied the request.

The defendants also objected to the PSR; both requested a downward departure on the ground that their conduct did not fall

---

[2] The grand jury indicted Hemmingson, Ferrouillet, Municipal Healthcare Cooperative, Inc., Ferrouillet & Ferrouillet, and Henry Espy on a variety of counts related to the money-laundering. On motion of Ferrouillet and Espy, the court transferred some of the counts to the Northern District of Mississippi. In the end, only Hemmingson and Ferrouillet remained as defendants in Louisiana. Following his conviction in Louisiana, however, Ferrouillet pleaded guilty to the transferred counts, which were then returned to Louisiana and consolidated for sentencing.

6

within the "heartland" of the money-laundering guideline, U.S.S.G. § 2S1.1. The district court agreed, granted the downward departure, and sentenced defendants to one year in a halfway house pursuant to the more lenient fraud guideline, U.S.S.G. § 2F1.1.

## III.

This is a consolidation of two appeals. Defendants argue that the evidence was insufficient to support their convictions, that the government's prosecution strategy violated their right to due process, and that the method of jury selection violated federal law and the Constitution. Ferrouillet challenges his sentence, claiming an entitlement to a downward departure on the basis of his "exceptional" history of charitable deeds and community service.

The government contends that the district court erred in granting the defendants a downward departure under the "heartland" theory. The government also says the court erred in refusing to upwardly adjust Ferrouillet's sentence for abusing his position of public trust and for his use of special skills in committing his crimes.

## IV.

In determining sufficiency of the evidence, we must decide whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Dupre*, 117 F.3d 810, 818 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 857 (1998). We view all evidence, and any inferences that may be

drawn from it, in the light most favorable to the government. *United States v. Sylvester*, 143 F.3d 923, 930 (5th Cir. 1998).[3]

A.

Defendants zero in on Hemmingson's intent and motive in writing the check to Ferrouillet. Their argument runs as follows: If Hemmingson did *not* intend the funds to reach Espy's campaign, the government's case collapses, because the convictions rest on the government's having proved that Hemmingson intended to defraud Crop Growers when drafting the check. The defendants reason that if Hemmingson acted honestlySSand was simply victimized by FerrouilletSSneither defendant, as required under the statutes, trafficked in "criminally derived property" or the "proceeds of unlawful activity," because the $20,000 would not have been taken from Crop Growers through fraud.

The defendants' theory is that Hemmingson wrote the check to Ferrouillet to secure the attorney's services in an honest, if ultimately fruitless, business venture. While they concede that Ferrouillet laundered the check, they argue that Hemmingson was just an innocent businessman, blind to Ferrouillet's sinister scheme and unaware of the check's "bizarre fate." Hemmingson, they claim, did not know that Ferrouillet had even guaranteed the loan, let alone that he planned to launder the check to pay it off.

Defendants point to evidence that they say shows Hemmingson

---

[3] The defendants challenge their convictions on each count, with one exceptionSSFerrouillet does not challenge sufficiency as to his convictions of making false statements.

8

believed he was engaging in a lawful business deal. They highlight Ferrouillet's connections to the NCBM and his past success in winning major insurance contracts for his clients. They also note Hemmingson's determination to expand Crop Growers's business into the health insurance market. Given Hemmingson's goals and Ferrouillet's expertise as a deal maker, it is perfectly understandable, the defendants say, that Hemmingson would hire Ferrouillet as a consultant capable of developing new markets for Crop Growers.

While the argument is plausible, it is undercut by considerable evidence that Hemmingson intended the check as a covert, illegal donation to the Espy campaign. The "consulting contract" between Hemmingson and Ferrouillet appears to have been a sham. No work was performed on the contract. Aside from the contract itself, neither side introduced *a single document* relating to the purported consultancy or to the health care plan that Ferrouillet was to help develop and market. Nor could counsel at oral argument identify any evidence that the consultancy was legitimate, despite our repeated efforts to elicit a single example. Evidently, the "close communication" promised in the contract never materialized.

Moreover, Ferrouillet, an attorney who bills his time, never entered on his time sheets any work for Crop Growers; his firm simply had no record that Crop Growers was a client. He never told his brother, the firm's managing partner, of the engagement. Finally, despite Ferrouillet's failure to secure the NCBM's

9

endorsement or to produce any sort of work product, Hemmingson never questioned the lawyer about the work he was ostensibly hired to perform, nor monitored his performance in any way, nor asked for his $20,000 backSSeven when Crop Growers's "Life and Health Division" folded in 1995. In sum, other than the check and the contract, the defendants introduced no documentary evidence that a legitimate business relationship existed.

The defendants' counter arguments fall short under our deferential standard of review. Hemmingson claims that he regularly cut deals in hugger-mugger fashion and rarely supervised the performance of outside consultants. He also says that the unusual manner in which he recorded the payment in Crop Growers's booksSSas a prepaid legal expense amortized over twenty monthsSSis further evidence that he had no intent to camouflage the transaction. These protestations, while plausible, are not enough to render the verdict irrational.

The government introduced additional evidence which, while not stemming from the instant transaction, casts light on Hemmingson's proclivity to use Crop Growers as a vehicle for political contributions. In early 1993, he solicited twenty-six people to contribute (in their own or their spouse's names) to Espy's campaign; these individuals were then reimbursed by Crop Growers. The payments were disguised in Crop Growers's books as travel advances, purchases of fixed assets, and the like.

Hemmingson argues that he did not realize this scheme was illegal, as he was relying on the advice of his accountants. He

also insists that this incident cannot be treated as probative of his intent to defraud Crop Growers, pointing out that a District of Columbia jury acquitted him of criminal conspiracy charges resulting from these contributions. But, at a minimum, this evidence illustrates Hemmingson's desire to support Espy's political fortunes and his willingness to employ Crop Growers as a means to this end.

Finally, the government introduced persuasive evidence of Hemmingson's repeated efforts to influence Michael Espy through his brother. The jury considered a fax Hemmingson sent to Henry Espy, asking him to pass along Hemmingson's "thoughts" on crop insurance reform to his brother. Similarly, on several occasions, Henry Espy was present when Hemmingson met with Michael Espy to discuss reform efforts. And the government introduced evidence showing that, after the earlier episode involving Hemmingson's orchestration of illegal contributions to the Espy campaign, Hemmingson hired a "consultant"SSthe immediate past director of the Federal Crop Insurance CorporationSSto draft a letter to Michael Espy.

The proposed letter, which was ultimately rephrased, concluded: "Perhaps, at some time in the future, we will be able to arrange a Mississippi tour for you and Congressman Henry Espy if our efforts on his behalf are successful (this part has to be subtle)." This evidence further suggests that Hemmingson sought to use Henry Espy as a conduit to the Secretary of Agriculture.

The defendants urge us to consider Hemmingson's legitimate, business-related reasons for writing the check to Ferrouillet. But

11

our task in deciding sufficiency of the evidence is not to choose between competing interpretations of events. It is simply to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the government, could have convicted. The evidence is easily sufficient.

B.

Hemmingson launches a series of separate challenges to the sufficiency of the evidence underlying his convictions of money-laundering (18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957). He claims that he did not aid and abet the money-laundering. He says he had no knowledge of Ferrouillet's villainous plan for the check, nor did he (as required for § 1956 liability) "conceal" or "disguise the nature" of anything. Finally, he says that he did not engage in money-laundering, because the check had not yet "attained the status of proceeds" at the time it was transferred from Ferrouillet to the grocery store.

Many of Hemmingson's arguments rehash the defendants' general sufficiency challenge. The gist of his claim is that his participation in the money-laundering scheme was so removed, and so speculative, that he cannot be criminally liable.

In *United States v. Willey*, 57 F.3d 1374 (5th Cir. 1995), we held that a defendant is liable for aiding and abetting money-laundering under § 1956(a)(1)(B)(i) when he "associated himself with the unlawful financial manipulations, [when] he participated

12

in them as something he wished to bring about, and [when] he sought, by his actions, to make the effort succeed." *Id*. at 1383 (quoting *United States v. Termini*, 992 F.2d 879, 881 (8th Cir. 1993)). Even if Hemmingson lacked knowledge of the nuts and bolts of Ferrouillet's plan, he had sufficient knowledge of, and association with, the unlawful conduct to support conviction; the evidence supported a finding that Hemmingson knew Ferrouillet would make sure that the Crop Growers money reached the Espy campaign in such a way as to conceal its origin.

Hemmingson's other arguments are equally meritless. He says that he never attempted to conceal the funds. The jury, however, was entitled to conclude, based on his curious accounting techniques, that he sought to camouflage the transaction. He also claims, in challenging his § 1957 conviction, that the check never amounted to "proceeds" as required by the statute. *See* 18 U.S.C. § 1957 ("the term 'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense"). Hemmingson's argument is that the *funds* from the check, not the check itself, constituted the "proceeds" of the crime.

If this were so, it would follow that at the time the check was deposited, it was not yet "proceeds," and therefore its deposit could not constitute money-laundering. We rejected a similar argument in *United States v. Cavalier*, 17 F.3d 90, 93 (5th Cir. 1994), where we treated a check issued as a result of the defendant's fraud as "proceeds" of the crime. Moreover, the statute, by referring to "*any property* . . . constituting proceeds"

13

(emphasis added), suggests that an as-yet-uncashed check may constitute proceeds. Accordingly, we reject Hemmingson's contention that no crime is committed until the funds are disgorged.

V.

Hemmingson accuses the government of engaging in maneuvers that deprived him of due process; he also raises, among other things, venue and severance objections. While we review questions of constitutional law *de novo*, *see United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995), venue and severance decisions are reviewed for abuse of discretion. *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989); *United States v. Moser*, 123 F.3d 813, 828 (5th Cir.), *cert. denied*, 118 S. Ct. 642 (1997).

A.

Hemmingson's due process claim is premised on the overlapping evidence in his District of Columbia and Louisiana trials.[4] He notes that even the government appeared to concede a high degree of overlap. But as the district court noted in denying his motion for transfer, the two indictments were based on separate events and separate crimes: The Washington indictment was premised on the reimbursement scheme, whereas the Louisiana indictment concerned the Ferrouillet episode. Although the evidence may have

---

[4] Hemmingson (along with Crop Growers) was prosecuted in the District of Columbia on charges relating to the reimbursement scheme. Crop Growers pleaded no contest; Hemmingson was acquitted on all counts.

14

overlapped, the key point is that the crimes differed. Accordingly, Hemmingson's due process rights were not violated.[5]

## B.

Hemmingson avers that the government assumed inconsistent litigating positions in the District of Columbia and Louisiana. He says that in the District of Columbia, the government portrayed Crop Growers as a defendant, whereas in Louisiana it portrayed Crop Growers as a victim.

The argument fails. The government characterized the *shareholders* of Crop Growers as the victim in each prosecution. The *company*, in contrast, was charged in the District of Columbia with vicarious liability for its officer's wrongful acts. Both the Louisiana and District of Columbia district courts considered Hemmingson's objection and approved the government's theory of the case.

In any event, we see nothing inconsistent, let alone prejudicial, regarding the government's drawing distinctions of this nature in cases involving a corporate officer's defrauding his corporation. As in shareholder derivative suits, the "corporation" is not necessarily a monolithic entity.

## C.

Hemmingson does not develop his forum-shopping argument;

---

[5] The government also points out that it would not have had venue in the District of Columbia to prosecute the Ferrouillet scheme, nor in Louisiana to prosecute the reimbursement arrangement.

rather, he breezily avers that the government forum-shopped by trying him first in Louisiana, even though he was first indicted in the District of Columbia.  Hemmingson offers not even a *soupçon* of evidence in support of his theory.  We see nothing that suggests that the order of trial resulted from anything other than happenstance and the district courts' respective schedules.


                                    D.

     Hemmingson claims that the Independent Counsel exceeded its jurisdictional mandate.  He says that the record does not show that Michael Espy participated in, or was even aware of, the money-laundering scheme.

     It is irrelevant whether Hemmingson is right on this point, for the instant prosecution falls well within the Independent Counsel's broad mandate.  He may investigate

> whether [Michael Espy] has committed a violation of any
> federal criminal law . . . relating in any way to the
> acceptance of gifts by him from organizations or
> individuals with business pending before the Department
> of Agriculture . . . [and] other allegations or evidence
> of violation of any federal criminal law . . . by any
> organization or individual developed during the
> Independent Counsel's investigation . . . and connected
> with or arising out of that investigation.

*In re Alphonso Michael (Mike) Espy*, Div. 94-2, Order at 2 (D.C. Cir. Sp. Div. Sept. 9, 1994).  At risk of belaboring the obvious, this prosecution's connection to Michael Espy is quite plain: Hemmingson, as a crop insurer heavily dependent on the Department of Agriculture, sought access to Michael Espy through Henry Espy, who, other than his fraternal tie, had little to commend him as an

                                    16

object of Crop Growers's beneficence.  Accordingly, the Independent Counsel acted within its jurisdictional mandate in prosecuting these defendants.

## E.

Hemmingson complains that the district court abused its discretion in denying his motion to sever his trial from Ferrouillet's.  His specific protest is that the jury heard expert testimony about Ferrouillet's nefarious deedsSSconcealment, structuring and the likeSSall of which reflected badly on Hemmingson, yet were tangential to the question of his guilt because they occurred *after* he gave Ferrouillet the check.  He also contends that evidence of Ferrouillet's false statements to FBI agents violated *Bruton v. United States*, 391 U.S. 123, 135-36 (1968), in that "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, [were] deliberately spread before the jury in a joint trial."  Hemmingson requested, but was denied, a limiting instruction on Ferrouillet's statements.

We do not agree that the court abused its discretion in refusing to sever or issue a limiting instruction.  With regard to the testimony of the money-laundering expert, the court *did* issue a limiting instruction; Hemmingson's complaint is that it was issued at the close of the evidence, a day after the testimony was heard.  Hemmingson does not cite any precedent establishing that the failure to issue a contemporaneous limiting instruction

17

constitutes reversible error. In any event, we do not regard the testimony as excessively prejudicial, and the limiting instruction was adequate to dispel any prejudice.

## F.

Hemmingson contends that the district court failed to issue a limiting instruction as to testimony regarding Ferrouillet's false statements. Although we agree that the court probably should have issued a limiting instruction under these circumstances, we cannot agree that its refusal to do so amounts to reversible error.

First, the testimony concerned charges that applied to Ferrouillet only. Unlike the situation in *Bruton*, the testimony could not be used directly against the silent defendant; Hemmingson's complaint is that he was tarred by the general aura of dishonesty surrounding Ferrouillet, rather than by any direct evidence relevant to a charge against him. Also in contrast to *Bruton*, the testimony can hardly be deemed "powerfully incriminating." It was far from a confession implicating Hemmingson.

Second, the court issued an instruction that, while not exactly a limiting instruction targeted to the false-statements testimony, served the same purpose. The court explained to the jury that it must consider the evidence of each count separately and consider the evidence against each defendant separately. This instruction, coupled with the likely harmlessness of the false-statements testimony, undercuts any claim of prejudice. A

18

defendant faces a high hurdle in proving a court abused its discretion in failing to offer a limiting instruction: He must show that he received an unfair trial and suffered "compelling prejudice." *United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir. 1980). Hemmingson has not carried that burden.

VI.

Ferrouillet argues that the method of jury selection violated the Jury Selection and Service Act of 1968 ("Jury Act"), 28 U.S.C. §§ 1861-1878, and the Constitution.[6] The crux of his claim is that he, a black man, was tried before an all-white jury.[7] The weak link in Ferrouillet's claim is that, as he concedes, the method of jury selection was entirely colorblind; he does not allege any sort of intentional race-based discrimination, but relies instead on the outcome of the selection process.

We apply a bifurcated standard of review to claims brought under the Jury Act. A decision to excuse an individual juror under the Act is reviewed for abuse of discretion; but to the extent the decision rests on the court's interpretation of the Act's language, the standard of review is *de novo*. *See United States v. Contreras*, 108 F.3d 1255, 1265 (10th Cir.), *cert. denied*, 118 S. Ct. 116

---

[6] His constitutional claim, which encompasses alleged violations of the Sixth Amendment's fair-cross-section requirement, the Equal Protection Clause, the Fifth Amendment's Due Process Clause, and the Sixth Amendment's right to counsel, is tacked on to the end of the statutory argument in his brief. It consists of a single paragraph and a footnote.

[7] Hemmingson, who does not allege that he is black, adopts Ferrouillet's argument.

19

(1997).

                                    A.

     The jury venire, drawn at random, included 109 people, of whom 24 were black.  This mirrored the demographics of the forum district, which, we are told, is 23% black.  As the trial was scheduled to last roughly two weeks (intruding on the Christmas season), the court mailed each venireman a questionnaire.  Both sides consented to the one hundred questions included within.  The court, based on the answers to the questionnaire and accompanying letters, excused 39 veniremen upon finding that their service would pose an "undue hardship or extreme inconvenience."  Seventy veniremen remained, ten of whom were black.  The court then randomly selected 32 veniremen for voir dire, two of whom were black and were struck via the government's peremptory strikes.[8]

     It is undisputed that the court did not excuse any venireman for racial reasons.  But Ferrouillet argues that instead of summarily dismissing the 39 for hardship on the basis of their questionnaires, the court should have summoned all of them to the courtroom and ascertained their race before dismissing them.  This, says Ferrouillet, would have ensured that the resulting pool was properly proportional.

     The obvious flaw in this argument is that Ferrouillet cannot satisfactorily explain how the result would have been different

_____

     [8] Ferrouillet does not claim that these peremptory strikes were exercised for anything other than a race-neutral reason.

20

even if the veniremen had personally appeared in the courtroom. He does not venture to suggest that the district court *should have* discriminated on the basis of race, even though this is the logical consequence of his argument. Instead, he contends that a personal examination would have shown that some of the proffered reasons for hardship were not so compelling after all. He buttresses his claim by comparing what he characterizes as the flimsy reasons of the 39 veniremen excused by mail to the purportedly persuasive reasons of those subjected to voir dire and *not* excused.

B.

The vehicle for Ferrouillet's challenge is the Jury Act, which provides that "all litigants in Federal courts entitled to trial by jury shall have the right to . . . petit juries selected at random from a fair cross section of the community in the district or division where the court convenes." 28 U.S.C. § 1861. Importantly, the statute allows the court to excuse a venireman for "any . . . factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror." 28 U.S.C. § 1869(j). These factors include a juror's distance from the courthouse or a family emergency. *Id*. In order to win relief under the Act, a defendant must prove a "substantial failure" to comply with its provisions. 28 U.S.C. § 1867(a). A substantial failure is one that destroys the "random nature or objectivity of the selection process." *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977).

21

Neither the Act nor the Constitution was violated here.  The court, upon reviewing the questionnaires, made reasonable, colorblind judgments about which veniremen faced hardship or inconvenience.  As Ferrouillet concedes, race never entered the picture.  His challenge to the allegedly arbitrary application of different standardsSSa lenient standard for excuse-by-mail; a more rigorous one for in-court, voir dire excuseSSfalls flat.

The examples of so-called arbitrariness Ferrouillet identifies do not even begin to support a finding that the jury was selected in a non-random manner.  We see no credible evidence of an abuse of discretion in excusing jurors, let alone evidence of racial discrimination.  The happenstance of a disproportionately white jury is simply not enough to prevail under the Act.

VII.

Ferrouillet challenges his sentence, arguing that the court erred in refusing to grant him a downward departure on the basis of his "exceptional" record of public service and his sundry charitable good deeds.  We lack jurisdiction to address this issue.[9]

Even were we to reach the question, Ferrouillet faces an uphill battle in the form of U.S.S.G. § 5H1.11, which provides that "civic, charitable, or public service . . . and similar prior good

_____

[9] *See United States v. DiMarco*, 46 F.3d 476, 477 (5th Cir. 1995) ("Because [the defendant's] challenge to his sentence involves only his dissatisfaction with the district court's refusal to grant a downward departure and not a legal error or misapplication of the guidelines . . . we lack jurisdiction over his appeal.").

works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." While the guidelines do permit departures in "exceptional case[s]," *see* U.S.S.G. ch. 5, pt. H, intro. comment, the court cannot be said to have abused its discretion in refusing to deem Ferrouillet's work "exceptional" and reduce his sentence.[10]

## VIII.

The government's appeal focuses on what it considers the excessively lenient sentences. It says the district court erred in failing to adjust Ferrouillet's sentence upwardly for his abuse of a position of public trust and use of special skills as an attorney. The government also claims the court erred in departing downward on the ground that the offenses fell outside the heartland of the money-laundering guideline. In light of our deferential standard of review, we disagree and affirm the sentences.[11]

## A.

The government contends the court should have boosted Ferrouillet's sentence pursuant to U.S.S.G. § 3B1.3, which provides for an upward adjustment when the defendant abused a position of public trust or employed a special skill "in a manner that

---

[10] *Cf. United States v. Peters*, 978 F.2d 166, 171 (5th Cir. 1992) (in which two Purple Hearts and a distinguished flying cross did not merit a downward departure for exceptional public service).

[11] The government's request to review the defendants' commitment designations is denied as moot.

significantly facilitated the commission or concealment of the offense." To bolster its claim that Ferrouillet used his attorney's skills, the government points to his drafting of the sham consulting contract and his use of law firm letterhead in correspondence with the Mississippi bank; the government contends that Ferrouillet's position as an attorney lent his wheelings and dealings an air of propriety. "The application of § 3B1.3 is a sophisticated factual determination reviewed under the clearly erroneous standard." *United States v. Fisher*, 7 F.3d 69, 70 (5th Cir. 1993).

While an attorney's skills qualify as "special skills" for purposes of § 3B1.3,[12] the court found that Ferrouillet did not employ these skills in committing his crimes. Although he drafted an engagement letter, he copied much of it from a standard form. More importantly, he never performed legal services to facilitate or conceal the crime. As the government emphasized in its case-in-chief, Ferrouillet never performed even pretextual legal work for HemmingsonSSindeed, this was the very reason the government contended their agreement was a sham. The court did not clearly err in making the factual determination that Ferrouillet's use of his legal skills did not, as § 3B1.3 requires, "significantly facilitate" the offense.

Nor did the court clearly err in determining that Ferrouillet

_____

[12] *See* U.S.S.G. § 3B1.3, application note 2: "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include . . . lawyers."

24

did not abuse his position of public trust in a manner that significantly facilitated the crimes. Although attorneys by definition occupy a position of public trust, *see United States v. Harrington*, 114 F.3d 517, 519 (5th Cir.), *cert. denied*, 118 S. Ct. 320 (1997), automatically enhancing an attorney's sentence would render the "significantly facilitate" language surplusage. If Ferrouillet did not employ his attorney's skills, it is difficult to see how his mere status as an attorney could have significantly facilitated the crime.[13] The court did not clearly err in rendering this factual finding.

B.

The government's primary argument on appeal targets the decision to depart downward on the basis that the defendants' conduct fell outside the heartland of the money-laundering guideline. Ferrouillet was convicted of sixteen felony counts, Hemmingson of three. As recommended in the PSR, the guideline range for each defendant was 41-51 months' imprisonment. The court determined that the offenses did not fall within the heartland of the money-laundering guideline, U.S.S.G. § 2S1.1, and instead applied the fraud guideline, § 2F1.1, sentencing each defendant to twelve months in a halfway house and work-release program.

---

[13] *Cf*. *Harrington*, 114 F.3d at 519 ("The record unambiguously establishes that Harrington used and abused his position as a lawyer in his effort [to commit the fraud].").

1.

We review for abuse of discretion a decision to depart from the guidelines. *Koon v. United States*, 518 U.S. 81, 96-100 (1996); *United States v. Walters*, 87 F.3d 663, 672 n.10 (5th Cir. 1996). A decision whether a particular factor is a permissible basis for departure is also reviewed for abuse of discretion, although this "is a question of law, and the court of appeals need not defer to the district court's resolution of the point." *Koon*, 116 S. Ct. at 2047. Should we determine that the court based its departure on a *mélange* of permissible and impermissible factors, we must decide "whether the district court would have imposed the same sentence had it not relied upon the invalid factor or factors." *Williams v. United States*, 503 U.S. 193, 203 (1992). If we conclude that the sentence would have differed, we must remand for resentencing. *Id*.

2.

The court made a "heartland" departure. A court may depart from the applicable guideline range when it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Unusual or atypical cases are not "adequately taken into consideration," hence the heartland departure. The guidelines explain:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of

26

> typical cases embodying the conduct that each guideline
> describes.  When a court finds an atypical case, one to
> which a particular guideline linguistically applies but
> where conduct significantly differs from the norm, the
> court may consider whether a departure is warranted.

U.S.S.G. ch. 1, pt. A, intro. comment. 4(b).  In this way, the heartland departure enables courts to avoid rigid application of the guidelines, provided they articulate reasons why they deem the case atypical.

The difficulty lies in identifying which factors a court may consider in evaluating atypicality.  In *Koon*, the Court directed sentencing courts to ask four questions:

> 1. What features of this case, potentially, take it
> outside the Guidelines' "heartland" and make of it a
> special, or unusual, case?
>
> 2. Has the Commission forbidden departures based on those
> features?
>
> 3. If not, has the Commission encouraged departures based
> on those features?
>
> 4. If not, has the Commission discouraged departures
> based on those features?

518 U.S. at 95 (quoting *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993)).  If the factor is *not* mentioned in the guidelines, the court must consider the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole" and decide whether the factor is sufficient to take the case outside the heartland.  *See Koon*, *id.* (quoting *Rivera*, 994 F.2d at 949).  The court must also bear in mind that departures based on grounds not mentioned in the guidelines are  "highly infrequent." *Id.* (quoting U.S.S.G. ch. 1, pt. A).

*Koon* teaches that discretion to depart is limited:  A court

27

may not do so on the basis of forbidden factors, or of a factor already taken into account by the guidelines, unless that factor is present to an exceptional degree or in some other way makes the case different from the ordinary case in which the factor is present. *Id*.[14] But *Koon* also stresses that courts of appeals owe considerable deference in reviewing a decision to depart:

> A district court's decision to depart from the Guidelines . . . will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court. Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.

518 U.S. at 98 (internal citation omitted). For an appeals court "[t]o ignore the district court's special competenceSSabout the 'ordinariness' or 'unusualness' of a particular caseSSwould risk depriving the Sentencing Commission of an important source of information, namely, the reactions of the trial judge to the fact-specific circumstances of the case . . . ." *Id*. at 99 (quoting *Rivera*, 994 F.2d at 951).

3.

Over the course of its twenty-five-page sentencing opinion, the court offered a series of reasons why it considered this case

---

[14] Factors such as the defendant's race, sex, and religion are expressly prohibited. *See* U.S.S.G. ch. 1, pt. A, intro. comment. 4(b). In determining whether the guidelines "take a factor into account," courts are confined to the guidelines and their policy statements and official commentary. *See* 18 U.S.C. § 3553(b).

atypical and therefore outside the heartland.[15]  First, the court

determined that the money-laundering guideline, U.S.S.G. § 2S1.1,

primarily targets large-scale money-laundering, which often

involves the proceeds of drug trafficking or other types of

organized crime.  The commentary to the guideline notes that the

underlying statute, 18 U.S.C. § 1956, is part of the Anti-Drug

Abuse Act of 1986.  Similarly, other district courts and even the

government (in a different case) have noted that the guideline

typically applies to drug-related offenses.[16]  The court

distinguished Hemmingson's and Ferrouillet's conduct from that

which ordinarily warrants sentencing under § 2S1.1SSnamely, large-

scale laundering of the fruits of organized crime.

The government argues that these factors are already taken

into account by the guideline, and therefore cannot serve as a

basis for departure.  It points out that the guideline provides for

a three-level increase if the defendant knew or believed the funds

were proceeds of drug trafficking, which implies that the guideline

encompasses more than just drug-related offenses.  *See* U.S.S.G.

§ 2S1.1(b)(1).

---

[15] The length of the court's explanation reflects the time and energy both sides invested in arguing sentencing issues.  The government, in the midst of this dispute, observed that "the sentencing guideline computations and arguments related to downward departure may have become among the most briefed in history."

[16] In *United States v. Caba*, 911 F. Supp. 630, 635 (E.D.N.Y.), *aff'd*, 104 F.3d 354 (2d Cir. 1996) (unpublished), a case involving a food stamp-for-cash scheme, the government conceded at oral argument that "the employment of the statute has almost always been in drug cases."  The court then concluded:  "The money laundering computations are derived from the guideline's relationship to drug crimes; it is that relationship which drives the high guideline level and would in this case produce a custodial range that grossly exaggerates the seriousness of the actual conduct."  *Id*. at 636.

The district court adopted the reasoning of *United States v. Caba*, 911 F. Supp. 630 (E.D.N.Y.), *aff'd*, 104 F.3d 354 (2d Cir. 1996), where the court held that the enhancement provision merely distinguishes between defendants who *knowingly* launder drug money, and those who are ignorant of the source of the illicit funds. This interpretation harmonizes with the elements of the money-laundering statute, which does not require knowledge of the source. More to the point, the government's argument that § 2S1.1 is not limited solely to drug offenses fails to engage the district court's observation that the statute targets both drug-related money-laundering *and* money-laundering that stems, more generally, from organized crime.

In any event, even if we agree that the guideline's heartland covers more than just money-laundering involving drugs or organized crime, we must decide whether the guideline's heartland encompasses the facts of *this* case. The district court relied on a Department of Justice manual, FEDERAL PROSECUTION OF ELECTION OFFENSES (6th ed. 1995), as evidence that it is highly unusual, given the facts of this case, to prosecute under the money-laundering statutes. The manual expressly states that "the use of conduits to conceal the fact that corporate funds were infused into a political campaign" should be prosecuted as a misdemeanor. *Id*. at 108. The manual also says that more serious crimes, such as aggravated campaign financing violations prosecuted as felonies, should be sentenced by using the fraud or conspiracy-to-defraud guidelinesSSboth of which provide more lenient sentences than does the money-laundering

30

guideline.  *Id*. at 135.[17]

The government argues that relying on the Department of Justice manual as evidence of typicality would transform the manual into a font of substantive rights.  Yet, looking to the manual as evidence of how the department recommends matching the conduct to the crime is a far cry from creating a new substantive right; it simply illuminates what the department considers typical.  *Koon* instructs courts to employ their "vantage point and day-to-day experience in criminal sentencing" to determine what is typical; that a court might consider the vantage point of prosecutors who routinely appear before the court is consistent with this general mandate.  Taking into account the collective wisdom and experience of the Department of Justice seems an effective means of ensuring regularity in sentencingSScertainly more so than would an exclusive reliance on individual experience.

The government contends, however, that the portion of the manual discussing Federal Election Campaign Act ("FECA") prosecutions is irrelevant, because the defendants were charged with money-laundering, not FECA violations.  Just because the defendants' *goal* was to violate FECA, the government reasons, does not absolve them of criminal liability for the other statutes they violated in pursuance thereof.  If a defendant commits murder in order to steal a car, he is prosecuted for murder, not car theft.

The government's argument amounts to a claim that the money-

---

[17] In fact, the court ultimately employed the fraud guideline, U.S.S.G. § 2F1.1, in fashioning the sentences.

31

laundering statute facially applies to the defendants' conductSSa point no one contests. As such, the government's challenge fails to engage the fundamental premise of the district court's reasoning: that Hemmingson's and Ferrouillet's conduct, when viewed alongside the conduct that is usually prosecuted under the money-laundering statutes, was atypical.

Contrary to the government's inference, the court did *not* rule that this was just an FECA caseSSand contrary to the defendants' arguments, this *is* not an FECA case. It is a money-laundering case, but an unusual one in that the goal was to conceal a corporate contribution to a defunct political campaign. The key question is whether the facts are sufficiently unusual to warrant a heartland departure.

The two cases the government relies on to prove the typicality of this prosecution reveal the weakness of its position. Both *United States v. Green*, 964 F.2d 365 (5th Cir. 1992), and *United States v. Carpenter*, 95 F.3d 773 (9th Cir. 1996), involved long-running schemes far more elaborate than the isolated instance of money-laundering that occurred here. In *Green*, the defendant was the Commissioner of Insurance of Louisiana who accepted concealed corporate contributions as bribes; in *Carpenter*, a state senator and two accomplices hatched a detailed plan to convert political contributions to private funds. While these cases support the government's position that it is not *unprecedented* to prosecute election-related wrongdoing under the money-laundering statutes, the government's failure to identify more than two casesSSboth of

32

which differ factually in important respects from the instant caseSScuts against its claim that this sort of conduct is ordinarily prosecuted as money-laundering.[18]

4.

In concluding that the defendants' conduct was sufficiently unusual to warrant departure, the district court followed *United States v. Winters*, 105 F.3d 200, 208 (5th Cir. 1997), in which we deemed it "incumbent on the district court to articulate relevant facts and valid reasons why the circumstances of this case were of a kind or degree not adequately considered by the Guidelines and thus sufficient to take it outside the heartland of relevant cases." The court did exactly that here, noting that the defendants were not seeking to legitimize a stream of illegal

---

[18] Ferrouillet attaches to his brief a recent report to Congress by the United States Sentencing Commission, *Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report* (Sept. 18, 1997). Although the district court did not rely on this report, which was issued after sentencing, the Commission's conclusions tend to support the court's reasoning. The Commission explained that its

> long-term analysis of money laundering cases also demonstrated that the intended relationship between the harm caused and the measurement of the offense seriousness under the money laundering sentencing guidelines has become distorted. Individuals who engaged in essentially the same offense conduct received substantially higher or lower sentences, depending on whether they were charged, convicted, and sentenced under the underlying offense-related statute, or the money laundering statute, or both.
>
> ...
>
> [T]he Commission's analysis of money laundering sentences reflects that disparate sentencing persists as a result of the structure of the current money laundering guidelines. . . . The potential for . . . disparate results between economic and drug trafficking offenses in connection with money laundering is problematic, and reinforces the need for fundamental revisions to the money laundering sentencing guidelines.

*Id*. at 7-8.

33

income into the mainstream economy. The court further noted that the source of the money was corporate funds rather than drug proceeds, or proceeds from some other unlawful activity. In sum, the court's conclusion, based on its vantage point and day-to-day experience in criminal sentencing, reflects nothing more than a determination that the particular facts of this caseSSmoney-laundering for purposes of concealing a corporate contribution to a defeated candidateSSwere atypical when compared to other prosecutions under the money-laundering statutes.

The guidelines grant considerable discretion in identifying facts and circumstances that warrant departureSSeither downward or upward. As the *Koon* Court noted, "the Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations which might bear upon the decision to depart." 518 U.S. at 94. The district court premised its decision on the unusual facts of this case; it also considered Department of Justice practice, the language and structure of the guideline, and the absence of caselaw supporting the government's claim to typicality. We cannot say that this constituted an abuse of discretion under *Koon*.


5.

The district court stated one reason for departure that we deem impermissible. The court observed that this prosecution was brought by an Independent Counsel and therefore "did not follow the traditional checks and procedures of a typical federal government

prosecution."[19]  We see no relevance between the fact that the United States is prosecuting through the Office of Independent Counsel and the appropriateness of a downward departure.

Characterizing a prosecution by the Independent Counsel as *per se* unusual would grant courts an automatic right to depart when sentencing in such cases.  We refuse to accept this reasoning.  "It is now established beyond dispute that . . . the Independent Counsel stands in place of the Attorney General and represents the United States in any proceeding within his or her jurisdiction." *In re Sealed Case*, 146 F.3d 1031, 1031 (D.C. Cir. 1998) (denial of rehearing en banc) (Silberman, J., concurring).

An Independent Counsel prosecutes in the name of the United States and enjoys "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice."  28 U.S.C. § 594(a); *Morrison v. Olson*, 487 U.S. 654, 662 (1988).  There is no basis, in our precedent or in practice, for deeming an Independent Counsel prosecution inherently suspect.  We do not believe, however, that the district court would have sentenced differently absent reliance on this impermissible factor.  *See United States v. McDowell*, 109 F.3d 214, 219 (5th Cir. 1997) (upholding upward departure based on one permissible and one impermissible reason).  Accordingly, its mistake in this regard is not reversible error.

---

[19] The defendants, in their briefs, abandon insinuation and cast subtlety to the wind.  Hemmingson's brief opens with the plaintive cry:  "WHAT WRATH HATH INDEPENDENT COUNSEL WROUGHT."

AFFIRMED.[20]

---

[20] The motion to supplement the record is denied.