United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 18, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-50252

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CHRISTINE APODACA,

Defendant-Appellant

--------------------
Appeal from the United States District Court for the
Western District of Texas, El Paso Division
No. EP-03-CR-1732 PRM
--------------------

Before GARWOOD, BENAVIDES, and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge: *

This case involves an appeal of an upward departure in Appellant's sentence for mail fraud. Appellant claims the district court based the departure on a misapplication of the U.S. Sentencing Guidelines as they existed pre-*Booker/Fanfan* and, because of *Booker*, she also argues that her mandatory sentence enhancements were unconstitutional. *See United State v. Booker*, 125 S. Ct. 738 (2005). We find no reversible error in the

---

\* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

district court's enhancements under the mandatory Guidelines. However, we do conclude that the lower court erred in upwardly departing from the Guidelines. Thus, we vacate the sentence and remand.

## I. Background

Defendant-Appellant Christine Apodaca pleaded guilty to a one-count information that charged her with mail fraud. The plea agreement waived her right to appeal her sentence, with the exception of any upward departure. The plea agreement's factual basis described how Apodaca in 1999 solicited money from various individuals to invest in a high-yield, risk-free enterprise. No such investment opportunity actually existed; Apodaca, in fact, operated a Ponzi scheme. In doing so, she defrauded her "investors" of almost $300,000.

Apodaca was initially assessed a total offense level of 24. This reflected a base offense level of six for violation of 18 U.S.C. § 1341, pursuant to the U.S. Sentencing Guidelines (U.S.S.G. § 2B1.1). It also included, based on the Sentencing Guidelines, (1) a 12-level increase because the loss exceeded $200,000 (U.S.S.G. § 2B1.1(b)(1)(G)), (2) a two-level increase because the offense involved more than ten victims (U.S.S.G. § 2B1.1(b)(2)(A)), (3) a two-level increase for abuse of trust (U.S.S.G. § 3B1.3), and (4) a two-level increase for obstruction of justice (U.S.S.G. § 3C1.1). The district court granted

2

Apodaca's request for a three-level reduction because of her acceptance of responsibility.  Thus, her final offense level was 21.

The U.S. Probation Office did not recommend any upward departure in this case.  However, the district court announced its intention to depart upward in sentencing Apodaca during the February 17, 2004, sentencing hearing:

> The Court in this case, based upon the circumstances of the Defendant, based upon the circumstances of the case, and based upon all of the information available, given the enormity of the crime that has been committed, given the number of victims involved and the amounts involved, the Court is going to depart upward in this case . . . .

The district judge further elaborated on the grounds for upward departure later in the same hearing.  In contrast to the earlier statement, the judge focused on the fact that Apodaca hired an impostor to assist her in her fraudulent scheme. Apodaca marketed her "investment" as being secured by a (fictitious) financier, named Clayton E. Wilson.  To placate some concerned "investors," Apodaca hired an individual to pose as Wilson for a meeting with these "investors."  Apodaca paid the impostor $1700 following this meeting.  During the sentencing hearing, the district judge chastised Apodaca for this particular ruse:

> I'm judging your judgement and your behavior on all of the days that you took advantage of all of these people, and the perpetuation of a scheme to the extent of going and hiring an impostor to play this role of being the person who secured the assets.  That's going the extra mile[;] that's the reason I departed upward in the case.

3

The court recessed and resumed on February 25th to deal with issues of restitution. The judge sentenced Apodaca to 54 months in prison and again mentioned the two-level upward departure, without providing further justification.[1] The court memorialized the grounds for departure in writing: "The sentence departs upward from the guideline range because of the high number of victims affected, and the amount of monetary loss incurred in this case." From this sentence, Apodaca appeals.[2]

## II. Discussion

---

[1]Apodaca argues that she did not receive sufficient notice of the district court's intent to upwardly depart, as required by Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 32(h) ("Before the court may depart from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission, the court must give the parties reasonable notice that it is contemplating such a departure. The notice must specify any ground on which the court is contemplating a departure."). *See also Burns v. United States*, 501 U.S. 129, 138-39 (1991). However, she was given one week's notice (the time between the first sentencing hearing and the actual sentencing on February 25th) and the judge set forth the grounds for the departure in that first hearing. This amount of time clearly constitutes sufficient notice. *See United States v. Clements*, 73 F.3d 1330, 1341 (5th Cir. 1996) (finding six day notice of intent to upwardly depart sufficient). And it is of no moment that Apodaca's initial notice was at the first sentencing hearing. *See United States v. Andrews*, 390 F.3d 840, 845 (5th Cir. 2004) (finding adequate notice where the court, following the initial sentencing hearing, "continued the case for thirty days, telling [the defendant] that it planned to depart upwardly to the maximum possible sentence for the offenses charged").

[2]The district judge *sua sponte* recognized an objection on the part of Apodaca to preserve the question of the departure's permissibility for appeal.

We review a district court's departure under the pre-*Booker* federal Guidelines *de novo*. *United States v. Bell*, 371 F.3d 239, 243 (5th Cir. 2004). *See also United States v. Villegas*, __ F.3d __, 2005 U.S. App. LEXIS 4517, *8-9 (5th Cir. Mar 17, 2005) (stating that our sister circuits have found "that *Booker* did not alter the standard for reviewing a district court's interpretation and application of the Guidelines"). Naturally, any related findings of fact, though, will be reviewed only for clear error. *See United States v. Deavours*, 219 F.3d 400, 402 (5th Cir. 2000). *Accord United States v. Doe*, 398 F.3d 1254, 1257 (10th Cir. 2005). Because of the lack of objection to the mandatory sentence enhancements during the proceeding in the lower court, we review Apodaca's *Booker* claim for plain error. *See Villegas*, __ F.3d at __, 2005 U.S. App. LEXIS 4517, *6.

**A. The District Court's Upward Departure**

The government concedes that neither the number of victims affected nor the magnitude of the monetary loss they suffered constitutes a legitimate ground for an upward departure from the Guidelines in this case. Rather, it argues that "the district court based its departure on the basis of Appellant going the 'extra mile' and hiring an imposter which made Appellant's case different from the ordinary."

Assuming that we are free to focus only on one comment in the sentencing colloquy and ignore what the district court

5

claimed in writing constituted its grounds for the upward

departure--an issue that appears to be unsettled in this Circuit

under now-excised 18 U.S.C. § 3742(e)--we hold that the district

court's upward departure was impermissible.  *See Bell*, 371 F.3d

at 245 (noting that "[t]he statutory framework is unclear as to

whether a reviewing court may consider 'factors' that are not

discussed in the written statement of reasons when making

determinations . . . ").[3]

The Sentencing Guidelines carve out a "heartland," or group

of typical cases that represent the conduct punished by each

guideline.  *See United States v. Grosenheider*, 200 F.3d 321, 330-

31 (5th Cir. 2000).  Thus, when deciding whether to depart from

the Guidelines, courts are instructed to determine whether "there

exists an aggravating or mitigating circumstance of a kind, or to

a degree, not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines that should

result in a sentence different from that described. "  18 U.S.C.

§ 3553(b)(1).  *See also* U.S.S.G. § 5K2.0.  "Unusual or atypical

---

[3]We again recently noted the problem caused by a trial
court's failure to clearly state in writing its grounds for
departure: "In deciding to grant an upward departure, the court
pronounced justifications in its oral pronouncement that were
different from those in its written opinion.  Although the
government correctly indicates that some of these grounds might
be legitimate bases for upward departure . . . , it is not
evident whether the statutory framework allows us to consider
factors that were in the oral explanation but not the written
one."  *Andrews*, 390 F.3d at 850.

cases are not 'adequately taken into consideration,' hence the heartland departure." *United States v. Hemmingson*, 157 F.3d 347, 360 (5th Cir. 1998). The Sentencing Guidelines explain: "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. ch. 1, pt. A, introductory cmt., 4(b).

The government argues that hiring an impostor to meet once with some "investors" to maintain the scheme's artifice makes Apocada's crime unusual enough to place it outside of the federal Guidelines' heartland. Thus, we need only consider this one factor of Apodaca's crime. It is clear that this factor, the hiring of an impostor, is not a factor that is forbidden, encouraged, or discouraged by the Sentencing Guidelines.[4]

"If the factor is *not* mentioned in the guidelines, the court

---

[4]"[A] sentencing court considering a departure should ask the following questions:

    '1) What features of this case, potentially, take it
    outside the Guidelines' 'heartland' and make of it a
    special, or unusual, case?
    '2) Has the Commission forbidden departures based on
    those features?
    '3) If not, has the Commission encouraged departures
    based on those features?
    '4) If not, has the Commission discouraged departures
    based on those features?'"

*United States v. Evans*, 148 F.3d 477, 484 (5th Cir. 1998)
(citations omitted).

must consider the 'structure and theory of both relevant individual guidelines and the Guidelines taken as a whole' and decide whether the factor is sufficient to take the case outside the heartland." *Hemmingson*, 157 F.3d at 361 (quoting *Koon v. United States*, 518 U.S. 81, 96 (1996)). It also must "bear[] in mind that departures based on grounds not mentioned in the Guidelines will be highly infrequent." *United States v. Barrera-Saucedo*, 385 F.3d 533, 536 (5th Cir. 2004).

Examining the grounds for departure provided in the notes to U.S.S.G. § 2B1.1, we recognize that none appear to be analogous to the ground given in this case. The application notes present the following "non-exhaustive" list of factors that can be used when considering an upward departure: (1) "A primary objective of the offense was an aggravating, non-monetary objective. For example, a primary objective of the offense was to inflict emotional harm."; (2) "The offense caused or risked substantial non-monetary harm. For example, the offense caused physical harm, psychological harm, or severe emotional trauma . . . ."; (3) "The offense involved a substantial amount of interest of any kind, finance charges, late fees, penalties . . . ."; (4) "The offense created a risk of substantial loss beyond the loss determined for purposes of subsection (b)(1)"; (5) "In a case involving stolen information from a 'protected computer' . . . the defendant sought the stolen information to further a broader criminal

purpose"; (6) "In a case involving access devices or unlawfully produced or unlawfully obtained means of identification" the victim was seriously hurt by his loss of identity (damaged credit, denial of employment, erroneous arrest, or diminished reputation) or the defendant assumed the victim's identity. U.S.S.G. § 2B1.1, application note 19(A). The notes further advise "that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes." *Id.* at 19(c). This loss could be loss to the defendant's direct victims or even a loss to society by diminishing public trust in government or charitable organizations. *See id.*

Strikingly, the application notes tend to focus on the result and/or goal of the fraud, not the type of lie told to induce the fraud nor the individual who actually lied to the victims. This does not mean that such features may never comprise sufficient grounds for an upward departure; rather, the Guidelines only inform our judgment, as we may look to them generally to assist in determining whether a feature of a crime removes it from the heartland. *See States v. Iannone*, 184 F.3d 214, 228 (3d Cir. 1999) (discussing commentary to fraud guideline when determining heartland through analysis of guideline's "structure and theory").

An examination of the encouraged grounds for departure

listed in § 5K2 strengthens this sense. *See id.* at 228-29 (analogizing to the rest of the Sentencing Guidelines in "structure and theory" analysis). Many deal directly with the effect the crime had on the victim or society. *See, e.g.*, U.S.S.G. § 5K2.1. (death); U.S.S.G. § 5K2.2. (physical injury); U.S.S.G. § 5K2.3. (extreme psychological harm); U.S.S.G. § 5K2.5. (property damage or loss); U.S.S.G. § 5K2.7. (disruption of government function). Others reflect particularly dangerous or heinous means. *See, e.g.*, U.S.S.G. § 5K2.4. (abduction of unlawful restraint); U.S.S.G. § 5K2.6. (weapons and dangerous instrumentalities); U.S.S.G. § 5K2.8. (extreme conduct). Again, this weakens the conclusion that hiring an imposter in this case removed Apodaca's fraud from the heartland.

Indeed, this case is noticeably different from other fraud cases applying former § 2F1.1 (the precursor to current § 2B1.1) where courts have found upward departures based on unmentioned grounds appropriate. For instance, when upholding a § 5K2.0 upward departure, the Second Circuit has found that "there is no indication that when it formulated punishments for mail fraud, the [Sentencing] Commission took into account the possible causation of massive environmental damage." *United States v. Paccione*, 949 F.2d 1183, 1205 (2d Cir. 1991). The Eighth Circuit approved an upward departure because, *inter alia*, the appellant-lawyer's fraud "irreparably harmed" "[his former] firm's goodwill

with the public and standing in the legal community" and "had financial repercussions on the firm, its shareholders and employees." *United States v. Moskal*, 211 F.3d 1070, 1074 (8th Cir. 2000). And the First Circuit approved an upward departure when defendant carried loaded gun while committing credit card fraud. *See United States v. Yates*, 973 F.2d 1, 6-7 (1st Cir. 1992) (noting that § 2F1.1 "does not list or mention as a relevant factor the possession or use of a firearm as a characteristic of that offense" and concluding that "[c]learly the presence of the loaded pistol was a circumstance beyond the 'mine run' of cases involving misuse of a credit card").[5] Courts have also found that frauds involving minors are outside of the heartland. *See United States v. Porter*, 145 F.3d 897, 904-06 (7th Cir. 1998) (finding no error in upward departure for use of fifteen year old girl in committing fraud); *United States v. Passmore*, 984 F.2d 933, 935-37 (8th Cir. 1993) (approving upward departure where adult defendant's accomplice in the fraudulent scheme was a female minor whom he corrupted and sexually abused since she was eleven years old).[6]

The Third Circuit approved an upward departure in a case

[5]Although § 5K2.6 provides possession of a weapon during commission of the offense as a ground for departure, the court explicitly departed upward under § 5K2.0.

[6]The Sentencing Guidelines have since been amended to increase the offense by two levels if a minor is involved in the crime's commission. *See* U.S.S.G. § 3B1.4.

where there were numerous factors of the crime it deemed "unmentioned" in the Sentencing Guidelines; these included, *inter alia*, that the defendant, in furtherance of his fraud, pretended that he was a highly decorated Vietnam veteran, that he was in the witness protection program, that he was a secret government agent, that he was recommended for the Congressional Medal of Honor, and that a drunk driver killed his family. *See Iannone*, 184 F.3d at 227-31. He also staged his own death causing his own family severe grief. *Id.* at 230. The Circuit Court acknowledged "that fraudulent misrepresentations [are] an inherent part of [this] offense and therefore, to a certain degree, are included in the base offense level for fraud." *Id.* However, it found that the district court did not abuse its discretion by concluding that the fraud calculated to "exploit [] victims' charitable impulses" featured "misrepresentations . . . beyond the usual 'heartland.'" *Id.* "The [district] court [also] found [the defendant's] repeated misrepresentations that he had received combat medals particularly offensive, noting that misrepresentation of the ownership of a combat medal may violate federal law." *Id.*

These cases all involve facts patently differentiating them from what is normally found in a fraudulent scheme. The government asserts that hiring an imposter as part of a fraudulent scheme is such a clearly unusual occurrence. In

12

reality, though, operators of illegal Ponzi schemes routinely hire or work in conjunction with other individuals to further the enterprise. *See, e.g.*, *United States v. Hayes*, 385 F.3d 1226, 1227-28 (9th Cir. 2004); *United States v. McCrimmon*, 362 F.3d 725, 727-28 (11th Cir. 2004); *United States v. Aptt*, 354 F.3d 1269, 1273-75 (10th Cir. 2004); *United States v. Maxwell*, 351 F.3d 35, 36 (1st Cir. 2003*)*; *United States v. Rogers*, 321 F.3d 1226, 1228 (9th Cir. 2003); *United States v. Morris*, 286 F.3d 1291, 1292-93 (11th Cir. 2002); *United States v. Gravatt*, 280 F.3d 1189, 1191 (8th Cir. 2002); United States v. Godwin, 272 F.3d 659, 663-66 (4th Cir. 2001). We are unable to identify a case where a court sentenced a Ponzi scheme defendant under § 2B1.1 (or § 2F1.1) and upwardly departed under § 5K2.0 due to assistance the perpetrator solicited.

This is not to say that the means utilized by an individual violating anti-fraud laws will never remove a case from the heartland. The Third Circuit's *Iannone* case is clearly such an example. However, we conclude that this single act, as framed by the district court, cannot possibly render Apodaca's scheme special or unusual in the commission of mail fraud. The one meeting in which Apodaca's impostor participated was merely a continuation of the on-going lie Apodaca had propagated. It rests directly at the heart of her fraudulent scheme. This is not a situation where the government contends that this fraud

differs significantly in kind from others or that Apodaca's general artifice was unusual. Rather, Apodaca merely had someone else tell the same lie she had been telling throughout. Recognizing that upward departures based on unmentioned factors are to be "highly infrequent," *Barrera-Saucedo*, 385 F.3d at 536, we reverse the district court because this particular technical detail of Apodaca's fraudulent method, standing alone, cannot possibly render this case "extremely rare," "extraordinary or even unusual in comparison to other cases . . . ." *United States v. Winters*, 174 F.3d 478, 485 (5th Cir. 1999).

Thus, we find that the upward departure was impermissible and vacate Apodaca's sentence.

### B. Mandatory Sentence Enhancements

Assuming *arguendo* Apodaca has not waived her right to appeal this aspect of her sentence, as she contends in her supplemental brief, we still cannot grant relief based on her *Booker* claim, because the enhancement of her sentence under the federal Sentencing Guidelines is not plain error. Simply put, Apocada fails to carry her "burden of establishing that the error affected the outcome of the proceeding." *United States v. Mares*, __ F.3d __, 2005 U.S. App. LEXIS 3653, *1 (5th Cir. Mar. 4, 2005).

We apply a plain error analysis because Apodaca failed to raise this issue at trial. *Id*. at *22. This Court will reverse

if the appellant can show that (1) there is error; (2) the error is plain; and (3) the error affects "substantial rights," *i.e.*, the error "must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 732-34 (1993). "'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings."'" *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). Clearly, Apodaca cannot meet the third prong. She points to nothing in the record indicating that, had the district court sentenced her under an advisory scheme, her sentence would be significantly shorter. *See Mares*, __ F.3d at __, 2005 U.S. App. LEXIS 3653, *27-28. Indeed, the trial court departed upward because it found her punishment under the mandatory Guidelines insufficient.

## III. Conclusion

Because we find that the district court erred under the federal Sentencing Guidelines by departing upward, we VACATE Apodaca's sentence and REMAND to the district court for re-sentencing.